COLEMAN v. UNITED STATES. DUNN et al. v. SAME. TRUSS v. SAME.

(Circuit Court, N. D. Alabama, S. D. September 10, 1910.)

Nos. 1,198, 1,196, 1,197.

1. UNITED STATES (§ 127*)—CLAIMS AGAINST—TAKING OR INJURY TO PROPERTY—JURISDICTION UNDER TUCKER ACT.

Tucker Act March 3, 1887, c. 359, 24 Stat. 505 (U. S. Comp. St. 1901, p. 752), authorizing suits against the United States, does not authorize a recovery of damages for a consequential injury to property not amounting to a taking and for which recovery could be had only in an action of tort.

[Ed. Note.—For other cases, see United States, Dec. Dig. § 127.*]

2. EMINENT DOMAIN (§ 98*)—"TAKING" OF PROPERTY.

In order that the flooding of lands resulting from the construction of a dam on a stream by the United States for the improvement of navigation shall constitute a "taking" of the land within the meaning of the fifth constitutional amendment, and entitle the owner to recover compensation therefor, it must amount to a permanent flooding and an actual ouster of the owner, the effect of which is the practical destruction of the value of the land. There is not such a taking where the land was previously subject to overflow each year in time of freshets, to such extent that it had not been cultivated for many years, and the only effect of the dam was to increase such overflows in extent and frequency, the land for the most part being free from water practically all the time; and in such case there can be a recovery only with respect to such portion as is permanently covered.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 252–255; Dec. Dig. § 98.*

For other definitions, see Words and Phrases, vol. 8, pp. 6851–6863; vol. 8, p. 7813.]

Actions against the United States by Thomas S. Coleman, by A. J. Dunn and J. N. Coleman, and by Martha C. Truss. Heard together. Judgment for the plaintiff Thomas S. Coleman, and for defendant in the other two actions.

Sterling A. Wood and Gardiner Green, for plaintiffs.
O. D. Street, U. S. Atty.

GRUBB, District Judge. These were suits filed by the respective plaintiffs against the United States, under the provisions of the Tucker act, to recover for the flooding, by the United States, of certain lands of the plaintiffs, located on the Coosa river, or its tributary, Broken Arrow creek, by the construction of a dam across the Coosa river. The three cases were, by agreement, tried together upon the same evidence, and the finding of facts and opinion apply in all of the cases.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The evidence showed that the plaintiffs owned and were in possession of the lands described in their respective petitions, at the time of the grievances therein complained of, and at the time of the trial; that in 1898 the United States, in improving the navigation of the Coosa river, which is a navigable stream, built a dam across the river at a point on the river about three-fourths of a mile below the land of the plaintiff Thomas S. Coleman; that in October, 1902, the United States raised the dam so constructed an additional height of 3 feet; that the dam was 700 feet in length and 15 feet in height; that the water of the river, in ordinary stage, just flowed over the dam; and that the entire length of the dam acted as a spillway. The evidence showed that the lands of plaintiff Thomas S. Coleman were on the bank of the Coosa river, about three-fourths of a mile above the dam; that the lands of the plaintiff Martha C. Truss and those of the plaintiffs A. J. Dunn and J. R. Coleman were on Broken Arrow creek, about 1½ miles from its junction with the Coosa river, which was about 1½ miles above the government dam on the river, the lands of the former lying down the creek from the lands of the latter, but close to them; that about two-thirds of the lands of Dunn and Coleman were bottom lands, and one-third hill lands; that the lands of Martha C. Truss and Thomas S. Coleman were creek or river bottom lands; that all the bottom lands were suitable for agricultural purposes, when cleared, except that they were subject to overflow in times of high water in the Coosa river; that none of the lands, except a small part of Thomas S. Coleman's, had been in cultivation since the War, and those of Dunn and Coleman and Martha C. Truss had the original timber still standing on them, when the dam was built and now, those of the latter having been cut over to some extent; that the lands of Thomas S. Coleman have no timber of any value or consequence on them; that other lands on Broken Arrow creek had been cultivated before the construction of the government dam, but their cultivation had been abandoned since the dam was built.

The evidence showed that the lands of all the plaintiffs had been accustomed to overflow in times of freshet in a way to injure crops long before the dam was built, but not to so great an extent as after its construction; that in dry seasons the bottom lands, similar to plaintiffs, would make a crop, but not in wet seasons, even before the construction of the dam; that the freshets in the river were likely to occur every month in the year, but principally from December to May or June; that the raising of the dam in October, 1902, raised the level of the water in the river at the mouth of Broken Arrow creek about three feet and caused the water to back up Broken Arrow creek to beyond plaintiffs' lands; that, except in times of freshet in the Coosa river, the backwater in the river and creek from the dam did not cause the water to get out of the bed of the creek on the lands of the plaintiffs Dunn and Coleman and Martha C. Truss at all, but did cause it to stand on about 2½ acres of the lands of Thomas S. Coleman in a slough that ran into the river; and that on this 2½ acres the backwater from the dam stood all the time. The evidence showed that both before and after the dam was built the water overflowed other parts of the lands of all of the plaintiffs in times of freshet, and that there

were low places on the lands of Dunn and Coleman and those of Mrs. Truss, into which the water flowed when the freshets came, and where it remained standing in ponds lower than the creek until it disappeared by evaporation; that when the water was just flowing over the dam, no part of the lands of any of the three plaintiffs was overflowed except the 2½ acres belonging to Thomas S. Coleman, nor was the water out of the channel of the creek as it flowed through the lands of Dunn and Coleman and of Martha C. Truss; that when the water, at the dam, was flowing over it three feet deep, there was but a half acre in the corner of Dunn and Coleman's land submerged, but the greater portion of Mrs. Truss' was under water at that stage; that when the water, at the dam, was flowing over the dam nine feet deep, practically all of the bottom land of Dunn and Coleman and of Mrs. Truss was under water.

The evidence showed that the lands on the creek and the river could only be successfully cultivated, after the dam was built, in dry seasons; that bottom lands not cleared on the creek or river were worth, at the time of the building of the dam, $15 an acre; that the timber on Dunn and Coleman's lands was reasonably worth $1,200 in its condition at the time of the trial, and that on Mrs. Truss' land $150; that a couple of acres of timber on the Dunn and Coleman land and a small amount on the Truss land had been killed by standing water; that the water neither before nor after the dam was built ever overflowed the hill land of the Dunn and Coleman tract, comprising one-third of it. The evidence showed that the effect of the dam was to back the water up Broken Arrow creek beyond the Dunn and Coleman lands, but not out of the creek banks, in times of ordinary water, and that in times of freshet on the river the effect of the dam was to back the water up the creek to a greater depth and extent than it was backed up by similar freshets before the dam was built, though such freshets had overflowed the lands on the creek, including those involved in the suits, every year since before the War. The evidence showed that there was a mill site on the lands of Dunn and Coleman which had not been used since the War, and that the building of the dam destroyed the value of the mill site, but only by deepening the water in the creek and thereby taking the fall out of it, and that the overflow on the lands of Thomas S. Coleman had destroyed one spring and had injured another. The evidence also showed that the lands of Dunn and Coleman were valuable for timber, cultivation, and milling, and those of Mrs. Martha Truss for timber and cultivation, and those of Thomas S. Coleman for cultivation only; that the values for all three purposes were impaired by overflows, both before and after the building of the government dam; that the overflows before the dam was built were due altogether to high water in the Coosa river, and after the dam was built to such high water aided by the government dam, which increased in extent and frequency the overflows on the lands above it on the river and creek, including those in suit.

Upon the forgoing facts, are the plaintiffs entitled to recover of the United States? This inquiry does not depend upon whether the lands of the plaintiffs were injured by the government dam, but upon whether the injury caused to them by it amounted to a taking of the

plaintiffs' lands, without compensation, within the meaning of the fifth amendment. For a consequential injury for which recovery could be had only in an action of tort, the Tucker act authorizes no suit against the United States. For recovery of compensation for a taking of property by the United States for an authorized improvement, the Tucker act authorizes an action. U. S. v. Great Falls Mfg. Co., 112 U. S. 645–656, 5 Sup. Ct. 306, 28 L. Ed. 846; Harley v. U. S., 198 U. S. 229, 25 Sup. Ct. 634, 49 L. Ed. 1029; Manigault v. Springs, 199 U. S. 473–484, 26 Sup. Ct. 127, 50 L. Ed. 274; Bedford v. U. S., 192 U. S. 217–225, 24 Sup. Ct. 238, 48 L. Ed. 414; U. S. v. Lynah, 188 U. S. 445, 23 Sup. Ct. 349, 47 L. Ed. 539; Mills v. U. S. (D. C.) 46 Fed. 738, 12 L. R. A. 673. These decisions also prescribe what constitutes a "taking," as distinguished from a mere consequential injury to property. In the case of U. S. v. Lynah, supra, the court quoted with approval from its opinion in the case of Transportation Co. v. Chicago, 99 U. S. 635, 642 (25 L. Ed. 336), the following:

"The extremest qualification of the doctrine is to be found, perhaps, in Pumpelly v. Green Bay Company, 13 Wall. 166 [20 L. Ed. 557], and 'in Eaton v. Boston, Concord & Montreal Railroad Co., 51 N. H. 504 [12 Am. Rep. 147]. In those cases it was held that permanent flooding of private property may be regarded as a 'taking.' In those cases there was a physical invasion of the real estate of the private owner, and a practical ouster of his possession. But in the present case there was no such invasion. No entry was made upon the plaintiffs' lot. All that was done was to render for a time its use more inconvenient."

In the same case the court said:

"But as a practical matter, and for the purposes of this case, we must, under the findings, regard the lands in controversy as irreclaimable and their value wholly and finally destroyed. Therefore, following the settled law of this court, we hold that there has been a taking of the lands for public uses, and that the government is under implied contract to make just compensation therefor."

In the case of Bedford v. U. S., supra, the court, distinguishing the case there under discussion from the Lynah Case, supra, and that of Pumpelly v. Green Bay Co., 13 Wall. 166, 20 L. Ed. 557, said (page 225 of 192 U. S., page 240 of 24 Sup. Ct. [48 L. Ed. 424]):

"In both cases, therefore, it was said that there was an actual invasion and appropriation of land as distinguished from consequential damage. In the case at bar the damage was strictly consequential. It was the result of the action of the river through a course of years."

In the case of Manigault v. Springs, supra, the court said (page 483 of 199 U. S., page 131 of 26 Sup. Ct. [50 L. Ed. 274]):

"We do not think the overflow to the minor extent indicated constitutes a taking of property within the meaning of the law, when the damage can be prevented by raising the banks, or that, if the damage stated did in fact result, it would justify the interposition of a court of equity.

"The question whether the overflow of lands constitutes 'a taking' within the constitutional provision has been discussed in several cases in this court (citing cases). A recent case is that of United States v. Lynah, 188 U. S. 445 [23 Sup. Ct. 349, 47 L. Ed. 539], wherein it was held that where the government had placed dams and other obstructions in the Savannah river in such manner as to hinder its natural flow, and to raise the water so as to overflow plaintiff's lands and to cause a total destruction of their value,

the proceeding must be regarded as an actual appropriation of the land, and created an obligation upon the government to make compensation for the land."

After discussing the Mills and Bedford Cases, supra, the court said in this same case (page 484 of 199 U. S., page 132 of 26 Sup. Ct. [50 L. Ed. 274]):

"We think the rule to be gathered from these cases is that where there is a practical destruction, or material impairment of the value of plaintiff's lands, there is a taking, which demands compensation, but otherwise where, as in this case, plaintiff is merely put to some extra expense in warding off the consequences of the overflow."

A fair construction of these decisions leads to the conclusion that, in order that a flooding of lands may constitute a "taking," it must be not only a direct physical invasion of private property, but must also act as an actual ouster and cause a practical destruction of the value of the land. It is true that the words "material impairment" are used by the court in the case of Manigault v. Springs, but in association with and as equivalents of the words "practical destruction." The other cases cited clearly indicate that a taking must be such a physical invasion of land as to amount to a permanent flooding and an actual ouster of the owner, the effect of which is the practical destruction of the value of the land overflowed. The other cases cited, as well as the previous extracts quoted from the case of Manigault v. Springs, itself, show that the words "practical destruction" control the meaning of the words "material impairment," used in the same context in that case.

The cases at bar are cases of occasional, as distinguished from permanent, flooding, except as to the 2½ acres of Thomas S. Coleman. The overflows are not the direct result of water backed up from the dam, for in ordinary stages of the river no water is backed on the lands of any of the plaintiffs, with the exception indicated. The lands were accustomed to overflow in times of freshet before the dam was built, and had not been cultivated since the war, probably influenced by this fact. The effect of the dam was only to make such overflows more frequent and of greater extent. The lands were unoccupied by backwater, even after the building of the dam, practically all the time. There was no ouster, except as to the 2½ acres. The impairment in agricultural value was conjectural, in view of the fact that there had been no cultivation since before the War. The destruction of the small portion of the timber, shown by the evidence, if conceded, to be the result of the increased overflow due to the construction of the dam, would constitute an injury to and not a taking of the lands on which it stood. The major part of the timber, the reasonable value of which was $1,350, was uninjured at the time of the trial. Clearly such an injury would not constitute a taking. Injuries analogous to those to the mill site and to the springs have been held by many cases to be in their nature indirect and consequential merely. Injury to both timber and crops, from overflows, was occurring frequently, if not annually, before any dam was built. The value of the lands for both purposes was diminished and impaired by the existence of such overflows and the likelihood of their recurrence each year, even before the dam was built. It will not be contended that these prior conditions amount-

ed to an ouster of plaintiffs from their property or to a practical destruction of its value. The effect of the dam was merely to increase the likelihood and extent of similar overflows and the damage resulting therefrom, and thereby impair the value of plaintiff's property for cultivation to a greater extent. The difference was one of degree only. There was still no ouster of plaintiffs from their lands, no practical destruction of their value, nor was there a permanent flooding except of the 2½ acres.

The lands of the plaintiffs aggregate 240 acres, of which but 2½ acres were permanently flooded; 40 acres were located three-quarters of a mile above the dam; and 200, three miles from it, and on one of the tributaries of the river on which it was located. An application of the principle that would require the United States to acquire and pay for all lands similarly situated to those in controversy, equally distant and equally remotely affected by the improvement and in equal proportion to the part injured, would operate as a practical prohibition of such improvements to navigable streams; and, while this result should not be held conclusive of plaintiffs' rights, it is persuasive against the correctness of the application contended for by them.

In my opinion, the only land which can be said under the facts to have been taken by the United States and for which the government can be called upon to pay in this proceeding, is the 2½-acre tract of Thomas S. Coleman, the reasonable value of which at the time of the taking by the government I find to be $37.50, which, with interest from the date of the taking, amounts to $49.50, for which, and his costs, judgment is entered in favor of the plaintiff Thomas S. Coleman. The petitions of the plaintiffs A. J. Dunn and J. R. Coleman and that of Martha C. Truss are dismissed, at petitioners' costs.

---

## The ANNA W.

(District Court, E. D. New York. August 22, 1910.)

1. COLLISION (§ 77*)—FAULT—ABSENCE OF LOOKOUT.

    The absence of a lookout on a vessel stationed where he should he will not render such vessel in fault for a collision, where she was navigated exactly as she should have been had there been a lookout reporting the situation.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 140–149; Dec. Dig. § 77.*]

2. COLLISION (§ 61*)—TUG AND TOW MEETING SCHOONER—NEGLIGENCE OF TUG.

    A collision between a schooner passing up the Main Ship Channel into lower New York Bay, at night, before the wind, but against an ebb tide at a speed of not more than 1½ knots and the tow of a meeting tug on a hawser 1,200 feet long, *held* due solely to the fault of the tug in failing to keep further toward the west side of the channel in view of her duty as the burdened vessel to keep out of the way and the length of her hawser, which by the set of the tide would cause her tow to sag to the eastward of her own course.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. § 61.*

    Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.