## SANGUINETTI v. UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 130.　Argued January 3, 1924.—Decided February 18, 1924.

A canal, constructed by the Government to improve navigation, overflowed intermittently, flooding the claimant's land but not ousting him from his customary user, except for brief periods, or inflicting permanent injury; and it did not appear either that the flooding was intended or anticipated by the Government or its officers, or that it was attributable directly, in whole or in part, to the improvement, rather than to natural conditions. *Held,* that no taking could be implied, and the United States was not liable *ex contractu.* P. 148.

55 Ct. Clms. 107, affirmed.

APPEAL from a judgment of the Court of Claims dismissing a petition.

*Mr. Benjamin Carter,* with whom *Mr. F. Carter Pope* was on the brief, for appellant.

*Mr. Solicitor General Beck* appeared for the United States.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The main portion of the City of Stockton, California, and the adjacent territory lie between the Calaveras river and the Mormon slough, both flowing in a general southwesterly direction. The streams are several miles apart and the intervening area, including appellant's land, has always been subject to inundation by overflow therefrom, as well as by reason of periodic heavy rainfall. During periods of high water sediment was deposited in large quantities in the navigable channel, interfering with navigation and entailing annual expenditures for dredging.

In view of this condition, Congress, in 1902, authorized the construction above the city of a connecting canal, by means of which the waters of Mormon slough were diverted into the Calaveras river. Act of June 13, 1902, c. 1079, 32 Stat. 368. The canal was constructed in accordance with plans prepared by government engineers, after investigation, upon a right of way procured by the State of California and conveyed to the United States. A diversion dam was placed in the slough, immediately below the intake of the canal. The excavated material was put on the lower side of the canal, making a levee, of which the dam was practically a continuation; but that this was not done with a view of casting flood waters upon the upper lands is apparent, since the engineers believed the capacity of the canal would prove sufficient under all circumstances. It was evidently the most convenient method of disposing of the material and also it may have contributed to strengthen the lower bank against erosion. The canal was completed in 1910. In January, 1911, there was a flood of unprecedented severity, and there were recurrent floods of less magnitude in subsequent years, except in 1912 and 1913. The capacity of the canal proved insufficient to carry away the flood waters, which overflowed the lands of appellant, lying above the canal, damaging and destroying crops and trees and injuring to some extent the land itself. Appellant brought suit against the Government to recover damages upon the alleged theory of a taking of the property thus overflowed. The land would have been flooded if the canal had not been constructed but to what extent does not appear. None of the land of appellant was permanently flooded, nor was it overflowed for such a length of time in any year as to prevent its use for agricultural purposes. It was not shown, either directly or inferentially, that the Government or any of its officers, in the preparation of the plans or in the construction of the canal, had any intention to thereby flood any of the

land here involved or had any reason to expect that such result would follow. That the carrying capacity of the canal was insufficient during periods of very heavy rains and extremely high water was due to lack of accurate information in respect of the conditions to be met at such times. The engineers who made the examination and recommended the plans, determined, upon the information which they had, that the canal would have a capacity considerably in excess of the requirements in this respect.

The Court of Claims concluded that none of the land here involved had been taken, within the meaning of the Fifth Amendment to the Constitution, and that, therefore, no recovery could be had upon the theory of an implied contract; but that the liability sought to be enforced was one sounding in tort, of which the court had no jurisdiction. Accordingly, the petition was dismissed.

Beginning with *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166, this Court has had frequent occasion to consider the question now presented. In that case, by authority of the State of Wisconsin, a dam was constructed across the Fox river, which had the effect of raising the ordinary water level and overflowing plaintiff's land continuously from the time of the completion of the dam in 1861 to the beginning of the action in 1867, resulting in an almost complete destruction of the value of the property. It was held that this constituted a taking in the constitutional sense, and the rule was laid down (p. 181) " that where real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking."

In *United States* v. *Lynah,* 188 U. S. 445, a dam had been constructed by the United States in such manner as to hinder the natural flow of a stream and, as a necessary result, to raise the level of its waters and overflow the land of plaintiff to such an extent as to cause a total

destruction of its value.   It was impossible to remove this overflow of water and the property, in consequence, had become an irreclaimable bog, unfit for any agricultural use.   It was held that the property had been taken and that the Government was liable for just compensation, upon payment of which the title and right of possession would pass.

In *United States* v. *Cress,* 243 U. S. 316, the Government by means of a lock and dam, had raised the water of the Cumberland river above its natural level, so that lands not normally invaded were subjected permanently to frequent overflows, impairing them to the extent of one-half their value.   A like improvement had raised the waters of the Kentucky river in the same manner so as to end the usefulness of a mill by destroying the head of water necessary to run it.   The findings made it plain that it was not a case of temporary overflow or of consequential injury but a condition of " permanent liability to intermittent but inevitably recurring overflows " and it was held that such overflowing was a direct invasion, amounting to a taking.

Under these decisions and those hereafter cited, in order to create an enforceable liability against the Government, it is, at least, necessary that the overflow be the direct result of the structure, and constitute an actual, permanent invasion of the land, amounting to an appropriation of and not merely an injury to the property.   These conditions are not met in the present case.   Prior to the construction of the canal the land had been subject to the same periodical overflow.   If the amount or severity thereof was increased by reason of the canal, the extent of the increase is purely conjectural.   Appellant was not ousted nor was his customary use of the land prevented, unless for short periods of time.   If there was any permanent impairment of value, the extent of it does not appear.   It was not shown that the overflow was the

direct or necessary result of the structure; nor that it was within the contemplation of or reasonably to be anticipated by the Government. If the case were one against a private individual, his liability, if any, would be in tort. There is no remedy in such case against the United States. *Keokuk Bridge Co.* v. *United States,* 260 U. S. 125.

The most that can be said is that there was probably some increased flooding due to the canal and that a greater injury may have resulted than otherwise would have been the case. But this and all other matters aside, the injury was in its nature indirect and consequential, for which no implied obligation on the part of the Government can arise. See *Gibson* v. *United States,* 166 U. S. 269; *Bedford* v. *United States,* 192 U. S. 217; *Transportation Co.* v. *Chicago,* 99 U. S. 635; *Jackson* v. *United States,* 230 U. S. 1; *Horstmann Co.* v. *United States,* 257 U. S. 138; *Coleman* v. *United States,* 181 Fed. 599.

The judgment of the Court of Claims is

*Affirmed.*