JACOBS v. UNITED STATES.

No. 5852.

Circuit Court of Appeals, Fifth Circuit.

Nov. 28, 1930.

Rehearing Denied Dec. 19, 1930.

A. A. Kelly, of South Pittsburgh, Tenn., and Chas. C. Moore, of Chattanooga, Tenn., for appellant.

C. B. Kennamer, U. S. Atty., of Birmingham, Ala. and R. M. Sims, Asst. U. S. Atty., of Florence, Ala.

Before BRYAN and WALKER, Circuit Judges, and HOLMES, District Judge.

WALKER, Circuit Judge.

This was a suit under the Tucker Act, 28 USCA § 41(20). The appellant sought to recover the alleged amount of damage caused by a dam constructed by the appellee under acts of Congress across the bed or channel of the Tennessee river, in Jackson county, Ala., at a location known as "Widow's Bar," to a farm owned by appellant and lying along Jones creek, a tributary of the Tennessee river, which dam was about eight miles below that farm and the mouth of Jones creek, and was completed about October 1, 1925. The court's findings of fact included, in addition to findings to the effect that that dam was constructed as above stated and for the purpose of providing water of sufficient depth throughout the year to facilitate navigation of the Tennessee river along its course, the following:

"That the said Widow's Bar Dam was designed to raise the river at extreme low water at the dam about 11 ft., so as to back up the water in the river to Hale's Bar Dam, located about twenty-six (26) miles up the river from Widow's Bar Dam, raising water at Hale's Bar at extreme low water one foot, deepening the channel and forming a canal for navigation at all seasons. This Widow's Bar Dam would not cause the river to overflow the banks of the river or its tributaries at low water and permanently submerge any lands, but would slightly increase the height of intermittent rises in the river up to a volume of 150,000 ft. per second. Intermittent rises occur in the Tennessee River every year, principally the winter and early spring months. * * *

"After completion of the Dam, complaint of damages was made by different land owners above the Dam, and thereupon, the defendant, United States, caused a survey to be made of the land above Widow's Bar Dam during the summer and fall of 1926 to ascertain what lands, if any, above the Dam might have been damaged by reason of the building of the Dam, including farm of the plaintiff, E. P. Jacobs. This survey was made by running contours at intervals of two feet elevation above the Widow's Bar Datum and calculating back water curves at various volumes of second feet flow in the river, ranging from twenty thousand to one hundred and fifty thousand cubic feet per second. Maps and drawings, illustrating this survey were prepared by the Engineers of the defendant and introduced in the evidence. The topographic map of Jones Creek and vicinity showing the farm of the plaintiff, E. P. Jacobs, the lands of his slightly affected together with crops growing on the land in the year 1929 introduced in evidence is made Exhibit F hereto; also another topographical map of the said plaintiff's farm introduced in evidence is made Exhibit No. 1 hereto, for the purpose of showing more plainly the contour elevations as found by the survey. All said maps to be sent up as a part of the record in case of appeal without being copied.

"As a result of this survey engineers of the defendant determined and the Court so finds that one hundred and fifteen and two-tenth acres of the farm of the plaintiff, E. P. Jacobs, above described, lies between contour elevations five hundred and ninety-two and five hundred and ninety-nine. Pursuant to authority from the Chief Engineer of the War Department, the District Engineer's Office of the United States at Florence, Alabama, wrote a letter to each land owner thought to be affected, including the plaintiff in this case of which the following to E. P. Jacobs is a sample:

"'800.222–WB. September 29, 1927.

"'Purchase of flowage rights.

"'Mr. E. P. Jacobs, Bridgeport, Ala. Dear Sir: This office has had under investigation for some time the effect of the construction of Widow's Bar Dam on the value of land adjacent to the pool formed by said dam. This investigation has now been concluded and it is found that part of your land lying below 599 contour, which is 14 feet

higher than the crest of the dam, is subject to overflow more frequently than before the dam was constructed.

" 'The government, therefore, desires to purchase from you the right to overflow that portion of your land lying below the 599 foot contour, the upper limit of flood damage which can be attributed to the construction of the dam. The area of this portion is 115.2 acres, more or less, and the Chief of Engineers has agreed to recommend payment of the sum of $1,082.31 for the easement of flowage on this property, subject to establishment of valid title.

" 'Please advise me at your earliest convenience whether you are willing to accept this amount in payment of the right to overflow your land. If you will accept the amount, the necessary abstract and conveyance will be prepared as soon as practicable, free of cost to you. If an examination of your title shows that same is defective the War Department will cause condemnation proceedings to be instituted provided the amount of the award is agreed upon in advance.

" 'In the event you are unwilling to accept the settlement offered, you may have recourse to the courts for relief, suing either in the local United States District Court or in the Court of Claims.

" 'Yours very truly,
" 'Hugh P. Oram,
" 'Captain, Corps of Engineers, District of Engineers.'

"All of said letter being admitted as competent by the Court over objections of counsel for the defendant, except the amount offered, that part being ruled incompetent by the Court.

"Some of the land owners accepted the offers and were paid the amount of damage estimated by the engineers of the defendant. Plaintiff declined the offer and brought this suit.

"All the acreage on the plaintiff's farm estimated by the engineers of the defendant to be slightly affected was subject to periodical or intermittent overflows from the river, prior to the construction of the dam in times of flood.

"The Court finds that all said acreage was subject to periodical or intermittent overflows from the river prior to the construction of the dam, and that the construction of the dam did not back water over any petitioners land, and that it requires a rise in the river of from seven and five-tenths feet to twelve and five-tenths feet above a twenty thousand foot per second flow to overflow said lands since the construction of the dam. That the overflows reaching petitioners land after the construction of the dam were not continued, but only occasional; that at most, said lands which had been subject to overflow before the dam was built became slightly more subject to such overflows since its construction. That plaintiff has not been ousted, nor has his customary use of the land been prevented unless for short periods of time. It was used for agricultural purposes prior to the construction of the dam, and is still capable of being so used, and has been used for farming purposes. Its use for agricultural purposes was impaired by the flood waters after the dam was built to some extent."

In the argument for appellant attention was called to provisions of two general rivers and harbors acts. One of those provisions, contained in such act approved July 27, 1916, made appropriation "for continuing improvement by the construction of locks and dams between Chattanooga, Tennessee, and Browns Island, Alabama, in accordance with the report submitted in House Document Numbered Three hundred sixty, Sixty-second Congress, second session, as modified by the report of the Board of Engineers for Rivers and Harbors, printed in Rivers and Harbors Committee Document Numbered One, Sixty-fourth Congress, first session, * * * Provided, That no contract shall be entered into for the construction thereof until the local interests shall assume and pay all claims for flowage damage or arrange to do so in manner satisfactory to the Secretary of War: Provided further, That one high dam or two low dams may * * * contribute the cost of all claims for flowage damage arising from either type of dams, respectively." Section 1 (39 Stat. 399, 400). The other provision, contained in a similar act approved March 2, 1919, was the following:

"The Secretary of War is hereby authorized to prosecute the work of improvement on the existing project for the section between Chattanooga, and Browns Island, in accordance with the recommendation in report submitted in Rivers and Harbors Committee Document Numbered 8, Sixty-fifth Congress, third session, and that the condition precedent requiring local interests to assume and pay all claims for flowage damages be waived." Section 1 (40 Stat. 1282).

Those provisions, of which we take judicial notice, may be taken into consideration, though they were not referred to in the findings of fact made by the court below. New

York Indians v. United States, 170 U. S. 1, 32, 18 S. Ct. 531, 42 L. Ed. 927.

■ If the appellant can recover, it must be upon an implied contract; for under the Tucker Act the consent of the United States to be sued is (so far as here material) limited to claims founded "upon any contract, express or implied." Whenever the government in the exercise of its governmental rights takes property, the ownership of which it concedes to be in an individual, it impliedly promises to pay therefor; and this is so though no act of Congress directed the appropriation of particular property which was appropriated or taken, if what the officers of the government did, acting under its direction, resulted in an appropriation of that property. United States v. Lynah, 188 U. S. 445, 465, 466, 23 S. Ct. 349, 47 L. Ed. 539; United States v. Cress, 243 U. S. 316, 328, 37 S. Ct. 380, 61 L. Ed. 746. But if, when government work or improvement was planned and done, it was not contemplated by the government, acting through its officers, that that work or improvement would involve or result in taking or materially injuring property other than such as the government already was entitled to, a promise by the government to pay for taking or injuring property cannot be implied, though it turns out that property actually taken or damaged belonged to a private party. The cause of action, if any, resulting from the government's claim turning out to be unfounded, and a property right of a private party being so violated, is one sounding in tort, for which no remedy is given by the Tucker Act. Tempel v. United States, 248 U. S. 121, 39 S. Ct. 56, 63 L. Ed. 162.

■■ It plainly appears from the court's findings of facts and from acts of Congress above quoted from that in planning and erecting the dam mentioned the Government contemplated that flowage damage to privately owned property would result therefrom, for which compensation would be payable. The court's findings of facts included findings to the effect that the dam mentioned slightly increased the height of intermittent rises in the river, that the overflows reaching appellant's land after the construction of the dam were not continued, but occasional; that his land which had been subject to overflow before the dam was built became slightly more subject to such overflows since its construction; that appellant's customary use of his land was prevented for short periods of time; and that the use of that land for agricultural purposes was impaired by the flood waters after the dam was built. Thus it appears

that the burden of the servitude to which, by reason of intermittent overflows, land of the appellant was subject before the dam was erected was increased as a result of the erection of the dam, and that the erection of the dam had the effect of interrupting appellant's customary use of his land, and of impairing to some extent the use of that land for agricultural purposes. As a riparian owner, appellant had the right to enjoyment of the natural flow of the river without burden or hindrance imposed by artificial means, and no public easement beyond the natural one can arise without grant or dedication, save by condemnation with appropriate compensation for the private right. United States v. Cress, 243 U. S. 316, 321, 37 S. Ct. 380, 385, 61 L. Ed. 746.

In material respects the instant case is quite like the last cited one. That case involved claims to compensation for the taking of lands and water rights by means of backwater resulting from the construction and maintenance by the government of certain locks and dams upon the Cumberland and Kentucky rivers, respectively, in the state of Kentucky, in aid of navigation upon those rivers. One of the claims dealt with in that case was based upon the fact that one of the government structures mentioned had the effect, as to land of the claimant which before the erection of that structure was not subject to overflow, of subjecting that land to frequent but intermittent overflows of water from the river. In dealing with the just indicated state of facts, the following was said in the opinion:

"There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other. If any substantial enjoyment of the land still remains to the owner, it may be treated as a partial instead of a total devesting. * * *

"But where, as in this case, the property owner resorts to the courts, as he may, to recover compensation for what actually has been taken, upon the principle that the government, by the very act of taking, impliedly has promised to make compensation because the dictates of justice and the terms of the 5th Amendment so require (United States v. Great Falls Mfg. Co., 112 U. S. 645, 656, 5 S. Ct. 306, 28 L. Ed. 846, 850; United States v. Lynah, 188 U. S. 445, 465, 23 S. Ct. 349, 47 L. Ed. 539, 546), and it appears that

less than the whole has been taken and is to be paid for, such a right or interest will be deemed to pass as is necessary fairly to effectuate the purpose of the taking; and where, as in this case, with respect to the 6⁹⁄₁₀ acres, land is not constantly but only at intervals overflowed, the fee may be permitted to remain in the owner, subject to an easement in the United States to overflow it with water as often as necessarily may result from the operation of the lock and dam for purposes of navigation."

A difference between the facts of the case just quoted from and those of the instant one is that in the former land of the claimant which previously had not been subject to be overflowed was made subject to intermittent overflows, and in the instant case the appellant's land which before the erection of the dam was subject to be overflowed became, as a result of the erection of the dam, more subject to overflows, with the result that his customary use of the land was interfered with and its use for agricultural purposes was impaired. The difference is only of degree and not of kind.

In argument it was contended in behalf of the appellee that to sustain appellant's claim would be inconsistent with the decision in the case of Sanguinetti v. United States, 264 U. S. 146, 44 S. Ct. 264, 265, 68 L. Ed. 608. The claim passed on and rejected in that case was that of an owner of land lying above a canal constructed, pursuant to an act of Congress, between the Calaveras river and the Mormon slough. From the court's statements of facts in its opinion the following appears: The canal and a diversion dam which was located in the slough immediately below the intake of the canal were constructed in accordance with plans prepared by government engineers after investigation. The engineers believed the capacity of the canal would prove sufficient under all circumstances. This being so, it was not in the contemplation of, or reasonably to be anticipated by, the government that the structure would have the effect of causing land above the canal to be flooded. The canal was completed in 1910. In January, 1911, there was a flood of unprecedented severity, and there were recurrent floods of less magnitude in subsequent years. The capacity of the canal proved insufficient to carry away the flood water, which overflowed the land of the claimant lying above the canal, damaging and destroying crops and trees, and injuring to some extent the land itself. Prior to the construction of the canal, that land had been subject to the

same periodical overflow. If the amount or severity thereof was increased, the extent of the increase was purely conjectural. It was not shown that the overflow was the direct or necessary result of the structure. "The most that can be said is that there was probably some increased flooding due to the canal and that a greater injury may have resulted than otherwise would have been the case."

A material difference between that case and the instant one is that the facts of the former preclude the implication of a promise by the government to pay for the taking of or injury to privately owned land, as when the canal was planned and constructed it was not contemplated by the government that the construction of it would result in taking or prejudicially affecting privately owned land; while in the latter a basis for implying such a promise is furnished by the fact that the government anticipated that the construction of the dam mentioned would cause flowage damage to lands located above it. In the Sanguinetti Case there was a ground for denying relief similar to the one which was given that effect in the case of Tempel v. United States, supra.

There are other material differences between the Sanguinetti Case and the instant one. It did not appear in the former that the overflow of the claimant's land was a direct or necessary result of the canal. Prior to the construction of the canal, that land had been subject to the same periodical overflow, and the extent and amount of the increase of the overflow, if any, was purely conjectural. In the latter, appellant's lands which were subject to overflow before the dam was built became more subject to overflows since its construction; appellant's customary use of his land has been prevented for short periods of time, and its use for agricultural purposes was impaired by flood waters after the dam was built. Though none of the findings of fact specify the extent of the impairment of the use of appellant's land for agricultural purposes, we think the findings of fact, including so much of the above set out letter as was made a part of those findings, fairly import that such impairment was substantial, and not merely trivial, and that the dam, by interrupting appellant's customary use of his land, and by impairing the use of it for agricultural purposes, prejudicially and substantially affected its value.

Nothing in the opinion in the case of Sanguinetti v. United States, supra, indicates an intention to disapprove of or to depart from rulings made in the case of United States v.

Cress, supra, or in other cases above cited. We are not of opinion that to sustain appellant's claim would be inconsistent with the decision in the case of Sanguinetti v. United States, supra.

For reasons above indicated, we conclude that the court erred in rejecting appellant's claim. Because of that error, the judgment is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

Reversed.