**William COOK, Plaintiff,**

v.

**CLEVELAND STATE UNIVERSITY, Defendant.**

No. 1:98 CV 0351.

United States District Court, N.D. Ohio, Eastern Division.

July 10, 2000.

William Cook, Beachwood, OH, pro se.

Roger M. Synenberg, Mary Jo Tipping, Synenberg & Marein, Cleveland, OH, for Defendants.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

WELLS, District Judge.

On 11 February 1998, plaintiff William Cook filed a complaint against defendant Cleveland State University ("CSU"), alleging CSU had taken his property at 2210 Payne Avenue in Cleveland, Ohio without proper compensation in violation of Art. I, § 9 of the Ohio Constitution, the 5th and 14th Amendments to the United States Constitution, and 42 U.S.C. § 1983. He further alleges CSU had violated his rights to both substantive and procedural due process and the equal protection clause. Mr. Cook seeks a writ of mandamus compelling CSU to commence appropriation proceedings with respect to his Payne Ave-

nue property. In the alternative, he seeks a permanent injunction "prohibiting and forever barring [CSU] from depriving [Mr. Cook] of his free and undisturbed use and quiet enjoyment of his property ... and forever barring ... CSU from confiscating and/or condemning [Mr. Cook's] property." (Amended Cplt. at 6–7.)

With respect to his takings argument, Mr. Cook set forth three claims. First, he contends CSU has taken his property by "freezing" it—*i.e.*, by making "it known through publications, newspaper articles, maps of the University and other means that it intended to purchase the Plaintiff's property located at 2210 Payne Avenue, Cleveland, Ohio." (Amended Cplt. ¶ 6.) As a result, Mr. Cook argues, he has been unable to find tenants who are willing to pay the market rental rate, and "no bank or lending institution will grant or guarantee any loan to any person to buy, build or construct or improve any building on the property owned by Plaintiff." (Amended Cplt. ¶¶ 7, 13, 20.)

Second, Mr. Cook claims his property has been taken by virtue of the fact that it lies within an urban renewal zone and that the City of Cleveland had designated CSU as a redeveloper in that zone.

Third, he maintains CSU has (a) published maps showing his property as part of CSU's Parking Lot M and (b) failed to erect physical barriers which would adequately differentiate that parking lot from his own property. According to Mr. Cook, these acts and/or failures to act constitute a physical taking insofar as they cause people to walk over his property, to drive over his property when exiting Parking Lot M, and to park on his property by mistake.

Following a seven-day bench trial, with the plaintiff proceeding pro se, the following findings of fact and conclusions of law are issued pursuant to Fed.R.Civ.P. 52(a).

---

1. FirstMerit Bank allegedly foreclosed on Mr. Cook's property and attempted to sell it, while this trial was in progress. A sheriff's sale was

## I. *Findings of Fact*

1. The defendant, CSU, is a state-funded institution of higher education located in downtown Cleveland, Ohio.

2. The plaintiff's property at issue in this case is located at 2210 Payne Avenue in Cleveland, Ohio. (Amended Cplt. ¶ 3.)

3. There is presently a service garage on the plaintiff's property and room for parked cars. (Pl's Ex. T–10.)

4. The property lies on the southeast corner of East 22nd Street and Payne Avenue and the northern edge of the CSU campus.

5. In 1969, Mr. Cook purchased a business on the property for $25,000 and rented the land on which it stood. (Trial Transcript [hereinafter "Tr."] at 117–18.)

6. In 1976, he purchased the property for approximately $62,000.[1] (Tr. at 123–24, 132.)

7. In September of 1985, Mr. Cook began leasing the property to others, allegedly because "business was bad." (Tr. at 130–31.)

8. Since 1985, Mr. Cook has regularly found tenants except for a period from mid–1993 until late 1995. (Tr. 123, 133.)

9. In 1970, the City Council of Cleveland, Ohio passed Ordinance 969–A–69 which designated the Central Core area of Cleveland as an urban renewal zone and thereby made it eligible to receive federal assistance. (Pls. Exs. 1–09 to 1–12, 1–13 to 1–14; Tr. at 2.)

10. Joseph Sidoti, Assistant Commissioner for the City of Cleveland and a credible witness, established that the Central Core area encompasses a large section of downtown Cleveland, including, but not limited to, the area around the CSU campus and Mr. Cook's property. However, the area

scheduled to take place on 22 May 2000. (Pl's Mtn. for TRO.)

around CSU has never been the subject of an urban renewal project, and the City of Cleveland has never applied for federal money to develop it. (Tr. at 2–11.) [2]

11. Over the past several decades, CSU has purchased land contiguous to or nearby the University for possible future expansion. (Tr. at 14.)

12. In addition, CSU has at various times published "Master Plans." Some maps set forth in these Master Plans and published in various newspaper accounts designate the area in which Mr. Cook's property lies for possible expansion. (Pl's Exs. 502, 504, 556.)

13. Christine Jackson (CSU's Vice President of Finance Administration) and Robert Criminger (CSU's Executive Director of Facilities Management) were both credible witnesses, and both established that CSU's various Master Plans are merely "blueprints" for the campus's future development and are always subject to change. (Tr. 14–15, 18, 114–15.)

14. According to CSU's policies and the State of Ohio's guidelines, before CSU acquires a piece of property, it must obtain appraisals from two MAI-certified appraisers. CSU may then offer the property owner no more than the average of the two appraisals plus 10%. (Tr. at 111.) If the seller wishes to obtain a price beyond the appraised values plus 10%, CSU will typically do without the property rather than institute eminent domain proceedings. Mr. Criminger testified that CSU tries "to work with people who are willing to sell their property and we do that most of the time. We do not have any desire to use eminent domain, and we only use that in an extreme circumstance." (Tr. at 12–13.)

15. CSU has conducted six appraisals of Mr. Cook's property—two in 1982, two in 1984, and two in 1988. (Tr. 19–21.)

16. In 1985, CSU offered Mr. Cook $130,000.00 for his property. (Tr. at 22–23, 122.) Mr. Cook testified he turned it down because he wanted "to bargain the price up." (Tr. at 122.)

17. Although he had both the right and the opportunity to hire an independent appraiser to value his property, Mr. Cook did not do so. (Tr. at 126.)

18. Mr. Cook has never signed a contract with a real estate broker, although he did attempt to sell his property in 1984 for between $52,000 and $53,000. (Tr. at 122–23; Cook Dep. at 22.)

19. CSU has not interfered with Mr. Cook's ability to sell his property on the open market. (Tr. at 127–28.)

20. In 1995, Mr. Cook began leasing his property to James Wade for $1,000 per month. Mr. Wade's original lease ran from 1995 to 2000, with an option to renew for an additional five-year period. In 2000, Mr. Wade exercised the option and now has a lease until 2005, with rent in the amount of $1,250 per month. (Tr. at 105–06.)

21. Mr. Wade operates an All–Pro Muffler & Brake shop on the property and rents parking spaces to the employees of several nearby businesses. (Tr. at 77–78, 101.)

22. Mr. Wade was a credible witness.

23. Mr. Cook has never asked Mr. Wade to purchase the property. (Tr. at 109.)

24. Mr. Cook's property is on a corner immediately adjacent to CSU's Park-

---

**2.** Mr. Cook argued at trial that CSU had been designated a redeveloper of the Central Core area. However, Mr. Sidoti testified that Ordinance 969–A–69 did not designate CSU as a redeveloper in the Central Core area (Tr. 9–10), and Mr. Cook submitted no evidence to the contrary.

ing Lot M. At several different times from approximately 1988 to approximately 1999, CSU produced schematic visitors' diagrams or "maps" which incorrectly showed the general area of Mr. Cook's property as part of Parking Lot M. (Tr. at 27–29; Pl's Ex. 7–8.)

25. In 1985, 1986, 1987, and 1998, CSU produced schematic visitors' "maps" which accurately showed Mr. Cook's property as being distinct from Parking Lot M. (Def's Exs. D–G.)

26. All of these "maps" were designed to give visitors to CSU a general sense of the location of key CSU buildings and parking lots. They are schematic representations, are not drawn to scale, and are meant to designate general areas, not to provide precise information. (Pl's Ex. 7–8; Def's Exs. D–G; Tr. at 116.)

27. Although Mr. Cook knew some of the CSU visitor "maps" incorrectly showed the precise area of his property under the designation for adjoining Lot M, he never contacted CSU to complain. (Tr. at 31.)

28. In reality, CSU's Parking Lot M is visually distinct and physically separate from Mr. Cook's property. Two sides of Mr. Cook's corner property—the north and west sides—are bounded by public streets and sidewalks. A chain-link fence and a highway guardrail also run along the west side. The fence and rail both continue along the south side of the property until they reach the back, southwest corner of the service garage. The back wall of the service garage blocks the remainder of the shared southern boundary between Mr. Cook's property and CSU's Parking Lot M. Turning the corner, the side wall of the garage blocks approximately one half of the shared eastern boundary. The other half of the eastern boundary is separated by a series of railroad ties along which cars can be parked and by an approximately six-inch height difference between the two properties. (Pl's Ex. T–10; Def's Ex. A.)

29. Neither Mr. Cook nor his tenants have chosen to replace or supplement the railroad ties along the only "open" segment between the properties with a more visible or a more permanent barrier. (Tr. at 106–09; 135–36.)

30. CSU has never interfered with the ability of either Mr. Cook or his tenants to fence or otherwise more clearly designate the property line. (Tr. at 106–07.)

31. Occasionally, CSU students and/or staff have parked on Mr. Cook's property, have walked across the property after parking on Lot M, or have driven over Mr. Cook's property in order to exit Lot M. (Tr. at 90–92, 97–98.)

32. No evidence was presented that these transient actions have damaged Mr. Cook's property or caused Mr. Cook to receive less rent from his tenants. (Tr. at 107–09.)

33. Mr. Wade stated he was not particularly disturbed when people parked on or walked across the property except for those occasions when such parkers prevented him from locking his gate at night. (Tr. at 90–93.)

34. In addition, Mr. Wade testified he has alleviated problems by renting parking spaces to employees of nearby businesses and having them park their cars along the boundary between Mr. Cook's property and Parking Lot M so as to create a barrier along the boundary presently blocked on the CSU side by railroad ties. (Tr. at 97, 104–05.)

35. Mr. Wade has put up a sign saying "parking available." The sign hangs on the side of the service garage facing 22nd Street. (Tr. at 101.)

36. On 2 April 1996, Mr. Cook received a loan for $150,000 from First National Bank of Ohio, using the property at 2210 Payne, an assignment of tenant

lease rents, and a second mortgage of $25,000 on his residence as collateral. (Pl's Mtn. for TRO, Docket No. 97.)

37. In 1999, Mr. Cook's former attorney hired Julian Vanni to do a retrospective appraisal of Mr. Cook's property for the purposes of litigation. (Pl's Ex. 555.)

38. Mr. Vanni was not a credible witness.

39. Mr. Vanni utilized three methods of valuation: the cost approach, the income approach, and the sale comparison approach. (Pl's Ex. 556.)

40. According to Roger D. Ritley, CSU's expert, an appraiser who used either the cost approach or the income approach to appraise Mr. Cook's property would reach inaccurate and misleading conclusions. (Ritley Tr. at 6–10.)

41. In addition, Mr. Vanni's report contained numerous significant errors. Among other things, (a) Mr. Vanni had compared Mr. Cook's service garage to properties in different zoning areas and, in one instance, to property in a different town; (b) he had used secondary rather than primary sources to gather comparison data; (c) partly as a result, he had at times used wholly inaccurate information to compute the cost-per-square-foot of other properties; and (d) his appraisal assumed Mr. Cook's property was a Class A property when it is a Class C property. (Tr. at 32–38, 47–50, 52, 71–74.)

42. According to Mr. Ritley, such errors would cause an appraiser to reach inaccurate and misleading conclusions. (Ritley Tr.)

43. Mr. Vanni admitted his appraisal contained numerous errors and stated those errors had resulted in part because he had "rushed" to complete it. (Tr. at 73.)

## II. *Conclusions of Law*

A. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

B. To prevail on his taking claims under either the United States or the Ohio Constitutions, Mr. Cook must show CSU interfered with his property in more than a minimal way. *See Amen v. City of Dearborn,* 718 F.2d 789, 795–96 (1983) (setting forth elements of takings claim); *State v. Whitehead,* 70 Ohio St.2d 37, 434 N.E.2d 732 (1982) (setting forth elements of takings claim).

■ C. Mr. Cook has failed to establish that CSU has caused a permanent, physical invasion of his property. Although CSU students or staff do occasionally park on, walk over, or drive across Mr. Cook's property, these actions are transient and occur only sporadically. They thus do not constitute a permanent, physical invasion of his land. In addition, CSU cannot be held accountable for the personal transportation decisions of its students or staff—particularly since Mr. Cook himself could have resolved any problems he believes exist by erecting a simple barrier between his property and Parking Lot M. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Sanguinetti v. United States,* 264 U.S. 146, 149, 44 S.Ct. 264, 68 L.Ed. 608 (1924) (to be a taking, the government's actions must "constitute an actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property").

■ D. Mr. Cook has also failed to establish that CSU deprived him of all—or even some—of the economically viable usages of his land. Even though CSU's Master Plans may have designated the area in which Mr. Cook's property lies as an area into

which it might expand, Mr. Cook now leases out his property for $1,250 per month; a bank loaned him $150,000 using the Property as partial collateral; he has chosen not to list the Property with a real estate agent; and in 1985 he voluntarily turned down CSU's offer of $130,000 for the Property. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). "A taking does not occur merely because governmental action burdens or restricts some particular right or interest in a parcel of land. Rather, before a taking occurs the government must deny the owner all or an essential use of his property... The mere decline in property values does not, per se, constitute a taking requiring compensation." *Amen* 718 F.2d at 795–96; *see also Sayre v. City of Cleveland,* 493 F.2d 64, 69 (6th Cir.1974) (declining to accept "the broad proposition ... that there is an unconstitutional taking whenever a city in the conduct of its urban renewal program commits acts that lead to the devaluation of property ... particularly where the city ... has neither initiated eminent domain proceedings, evidenced any intent to begin procedures, or physically invaded the property"); *Woodland Market Realty Co. v. City of Cleveland,* 426 F.2d 955, 958 (6th Cir.1970) (holding a property owner was not entitled to compensation even though his property was immediately adjacent to an urban renewal area and the property had declined in value. "[A]ctions done in the proper exercise of governmental powers which do not directly encroach upon private property, though they may impair its use or value, do not amount to a taking of such property within the meaning of the constitutional provision."); *State v. Whitehead,* 70 Ohio St.2d 37, 39, 434 N.E.2d 732 (1982) (holding a taking exists only if the plaintiff can show "a substantial or material interference with property rights, as well as substantial or special injury. 'Any actual and material interference with such (property) rights which causes special and substantial injury to the owner, is a taking of his property'" (internal citations omitted).)

E. Mr. Cook has failed to establish that CSU has violated his right to substantive due process. *See Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).

F. Mr. Cook has failed to establish that CSU has violated his right to procedural due process. *See Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

G. Mr. Cook has failed to establish that CSU has violated his right to equal protection. *Pennell v. City of San Jose,* 485 U.S. 1, 14, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988).

H. Mr. Cook has failed to establish CSU violated 42 U.S.C. § 1983. *Ellison v. Garbarino,* 48 F.3d 192, 194 (6th Cir.1995) (stating petitioner bringing claim under 42 U.S.C. § 1983 must show "the deprivation of a right secured by the Constitution or laws of the United States").

### III. *Conclusion*

Because Mr. Cook has failed to establish any of the claims raised in his amended complaint, judgment is entered in favor of defendant Cleveland State University and against plaintiff William Cook. Mr. Cook shall pay costs.

IT IS SO ORDERED.

### *JUDGMENT ENTRY*

This Court, having previously entered its findings of fact and conclusions of law, hereby enters judgment in favor of defendant Cleveland State University and

against plaintiff William Cook. Mr. Cook shall pay costs.

IT IS SO ORDERED.