NEWMAN, Circuit Judge,
dissenting.
The Court of Federal Claims found that the six years of improper government induced flooding caused substantial damage to the Donaldson Black River Wildlife Management Area. The flooding resulted from deviations from the agreed water release schedule of the Clearwater Dam Water Control Manual, which schedule had been in place since 1953 and had operated, without injury to the preserve, until the Army Corps of Engineers decided to depart from the Manual and to provide increased flooding from 1993 through 2000. The Arkansas Commission raised strong objections, but the increased flooding was not abated. The Court of Federal Claims found, and my colleagues on this panel do not dispute, that the destruction of valuable hardwood and other injurious changes in the Arkansas preserve were due to these extensive improper flooding activities.
After the continuing protests by the Commission, the Corps of Engineers finally came to investigate in March 2001 and immediately ceased the increased flooding, stating that there was “clear potential for damage to bottomland hardwoods.” Transcript of Colonel Holden’s Remarks to the Black River Operations Public Meetings, April 25 and 26, 2001. J.A. 9802. However, the damage had already been done.
The Court of Federal Claims, after a two-week trial including eighteen witnesses, documentary evidence, and an actual site visit, held that a taking of property had occurred in terms of the Fifth *1380 Amendment, and awarded damages for the losses incurred.[1] My colleagues on this panel now conclude that no taking occurred and no liability ensued, giving the reason that the Corps eventually abated its destructive flooding. In so ruling, the court departs from constitutional right and well-established precedent. I respectfully dissent.
Discussion
This Wildlife Management Area spans approximately 23,000 acres along the banks of the Black River in north-eastern Arkansas. The Management Area serves as a hardwood timber resource with systematic harvests of mature oak, and also provides habitat for migrating water-fowl and serves as a hunting preserve. The Water Control Plan for Clearwater Dam had been in place for forty years; the water-release plan had been devised after five years of experimental study and interaction of all the interests served by these waters, and served these interests well, until 1993, when the Corps of Engineers began to deviate from the authorized Plan. The Commission repeatedly complained to the Corps that the deviations were causing extensive flooding that was damaging the bottomland hardwoods and other aspects of the Wildlife Management Area. The Corps did not investigate until 2001, when it confirmed the Commission’s concerns and returned to the authorized Water Control Plan.
The floodings drove the hardwood ecosystem to a state of collapse, killing most of the red oaks and many white oaks. Although bottomland ecosystems exist with naturally-occurring seasonal flooding and other climate variations, the nuttall oak and overcup oak, in particular, could not tolerate this artificial flood regime that covered the trees’ root systems for extended unnatural periods during the growing season, for six consecutive years. The record states that the increased releases in 1999 and 2000 were less injurious because there was a drought, but the damage had already been done.
The Court of Federal Claims found that the government was responsible for the flooding and the injury caused thereby, that “the damage done to the Commission’s property interest in its timber was permanent rather than temporary,” and that “the government’s superinduced flows so profoundly disrupted certain regions of the Management Area that the Commission could no longer use those regions for their intended purposes, i.e., providing habitat for wildlife and timber for harvest.” 87 Fed.Cl. at 620. The court found that “the Corps of Engineers had been repeatedly warned by members of the Commission,” and that “the effect of deviations in the Management Area was predictable, using readily available resources and hydrologic skills.” Id. at 622-23. My colleagues do not dispute these findings. Instead, my colleagues rule that no property interest was taken in Fifth Amendment terms, on the theory that “[bjecause the deviations from the 1953 plan were only temporary, they cannot constitute a taking.” Maj. op. at 1378. This conclusion, and the reasoning on which it is based, diverge from constitutional precedent, and contravene the large body of decisions arising from government operations involving water management.
Government-induced flooding is a recognized physical intrusion. The Court has “long considered a physical intrusion by *1381 government to be a property restriction of an unusually serious character for purposes of the Takings Clause.” Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In Loretto the Court cited flooding cases to illustrate the constitutional treatment of temporary intrusions, observing that they are subject to a “complex balancing process,” id. at 436 n. 12, 102 S.Ct. 3164. Applying this balancing process to floodings, the courts have recognized that “isolated invasions, such as one or two floodings ..., do not make a taking ..., but repeated invasions of the same type have often been held to result in an involuntary servitude.” Ridge Line, Inc. v. United States, 346 F.3d 1346, 1357 (Fed. Cir.2003) (quoting Eyherabide v. United States, 345 F.2d 565, 569 (Ct.Cl.1965)). When the invasion “preempts] the owner’s right to enjoy his property for an extended period of time,” the principles of constitutional deprivation of property apply. Id. at 1356.
Precedent well establishes that when property “is actually invaded by superinduced additions of water ... so as to effectively destroy or impair its usefulness, it is a taking within the meaning of the Constitution.” Pumpelly v. Green Bay Co., 80 U.S. 166, 181, 13 Wall. 166, 20 L.Ed. 557 (1872). Precedent does not require constant or permanent flooding, and eventual abatement of the flooding does not defeat entitlement to just compensation; the specific facts must be considered, as for any invasion of property. See, e.g., United States v. Dickinson, 331 U.S. 745, 751, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) (finding a taking although the plaintiff reclaimed most of the land that the government had flooded); United States v. Cress, 243 U.S. 316, 328, 37 S.Ct. 380, 61 L.Ed. 746 (1917) (a taking occurred where the erection of a lock and dam subjected the plaintiffs land to frequent overflows of water that were intermittent but recurring); Ridge Line, 346 F.3d at 1354-1355 (finding that there may be a taking although the property owner had constructed water detention facilities that abated the flooding); Cooper v. United States, 827 F.2d 762 (Fed.Cir.1987) (finding a taking where flooding was remedied by the Corps after five years); Barnes v. United States, 538 F.2d 865, 869, 872 (Ct.Cl.1976) (finding a taking where a government dam caused parts of the plaintiffs land to be subject to additional intermittent flooding, reducing crop yields); Eyherabide, 345 F.2d at 570 (“The measure of plaintiffs’ recovery is for the temporary taking (from 1954 through 1959),” when the plaintiffs land was subject to intermittent physical invasions during that period.).
In turn, short duration floods have been held not to constitute a taking. See, e.g., Hartwig v. United States, 485 F.2d 615, 620 (Ct.Cl.1973) (“The principle may be reduced to the simple expression: One flooding does not constitute a taking.”). As another example, the flooding in National By-Products, Inc. v. United States, 405 F.2d 1256, 1257 (Ct.Cl.1969), lasted for only two months, and the court held that the event did not rise to the level of a taking. Also, on facts where the flooding did not produce extensive or permanent damage, a taking did not occur, as in Sanguinetti v. United States, 264 U.S. 146, 149-50, 44 S.Ct. 264, 68 L.Ed. 608 (1924) (“Prior to the construction of the canal the land had been subject to the same periodical overflow.... If there was any permanent impairment of value, the extent of it does not appear. It was not shown that the overflow was the direct or necessary result of the structure; nor that it was within the contemplation of or reasonably to be anticipated by the Government.”).
*1382 When the plaintiff actually benefitted from the government operation, no taking was found, as in Fromme v. United States, 412 F.2d 1192 (Ct.Cl.1969), where construction of a channel caused two years of flooding that left part of the plaintiffs land in a boggy and weedy condition, a condition that was expected to disappear within two to three years. Citing evidence that the land had previously been subject to occasional flooding, and that the new channel was “very beneficial to the plaintiff in connection with the development of an extensive and valuable deposit of sand and gravel in her land,” the court concluded that “the evidence in the record fails to show a taking.” Id. at 1194-97.
Precedent recognizes that the flood-induced destruction of timber is permanent injury, and is compensable within the meaning of the Fifth Amendment. On facts close to those herein, in Cooper v. United States, 827 F.2d 762 (Fed.Cir. 1987), during the five-year period in which the Corps of Engineers was conducting construction along a waterway, river blockage subjected Cooper’s timbered land to standing flood water for prolonged periods during the spring and summer growing seasons, killing the timber. The court held that the United States had effected a taking, although the flooding was abated by the Corps after five years. Id. at 763-64 (citing Armstrong v. United States, 364 U.S. 40, 48, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); Murray v. United States, 817 F.2d 1580, 1583 (Fed.Cir.1987) (destruction of a property interest is a compensable taking within the meaning of the Fifth Amendment)). The court in Cooper awarded compensation based on the value of the destroyed timber. Id. at 764.
Binding precedent directly contravenes the court’s decision today. The floods in Cooper and the government activity that caused them were no less “inherently temporary,” the words by which the majority characterizes the flooding, see maj. op. at 1378, than the recurring flood releases here. In Cooper the flooding recurred each year, for as long as the river was clogged by the construction conducted by the Corps, just as the flooding here recurred each year, for as long as the Corps continued the improper release deviations.
Contrary to the court’s holding today, no court has held that flooding damage is never compensable if the flooding is eventually stopped, whatever the injury. The decision in Fromme is misapplied by my colleagues, for Fromme illustrates the traditional balance that characterizes takings decisions, not a per se rule against taking if the flooding is eventually stopped. The Court of Federal Claims correctly held that: “The Supreme Court permits recovery based on temporary takings.... In effect, the temporary taking of a flowage easement resulted in a permanent taking of timber.” 87 Fed.Cl. at 624. The trees that were killed did not revive. No error has been shown in the trial court’s view of the facts and law.
My colleagues err in their analysis, incorrectly holding that the issue is solely whether the injurious flooding was eventually ended. My colleagues err in ruling that: “we do not focus on a structure and its consequence. Rather we must focus on whether the government flood control policy was a permanent or temporary policy.” Maj. op. at 1377. That view of the Fifth Amendment is incorrect. See, e.g., Owen v. United States, 851 F.2d 1404, 1412 (Fed. Cir.1988) (en banc) (“[I]t is not the location of the cause of the damage that is relevant, but the location and permanence of the effect of the government action causing *1383 the damage that is the proper focus of the taking analysis.”). The question is not solely whether the Corps’ departure from the flood control policy of the Water Control Manual was permanent or was abated after six years, but whether the increased flooding caused significant injury before the flooding was abated, such that, on balance, the Fifth Amendment requires just compensation.
The panel majority appears to acknowledge that “if particular government action would constitute a taking when permanently continued, temporary action of the same nature may lead to a temporary takings claim,” maj. op. at 1374, but then discards this possibility as a matter of law in concluding that “the deviations were by their very nature temporary and, therefore, cannot be ‘inevitably recurring’ or constitute the taking of a flowage easement.” Maj. op. at 1376. Thus the panel majority holds, contrary to law, that because the improper Arkansas flooding was not of permanent duration, there cannot be a taking despite the permanent flood damage. See, e.g., Navajo Nation v. United States, 631 F.3d 1268, 1278 (Fed.Cir.2011) (“Indeed, our precedent requires that temporary reversible takings must be analyzed in the same constitutional framework applied to permanent irreversible takings.”) (quoting Yuba Natural Res., Inc. v. United States, 821 F.2d 638, 641 (Fed.Cir. 1987)); Skip Kirchdorfer, Inc. v. United States, 6 F.3d 1573, 1583 (Fed.Cir.1993) (explaining that the “limited duration of [a] taking is relevant to the issue of what compensation is just, and not to the issue of whether a taking has occurred”).
The findings of the Court of Federal Claims are not disputed by my colleagues as to the nature, cause, and amount of the damage to the Arkansas property. The determination that a compensable taking occurred is fully in conformity with precedent. My colleagues’ ruling contradicts the entire body of precedent relating to the application of the Fifth Amendment to government-induced flooding. I respectfully dissent.

. Arkansas Game & Fish Comm’n v. United States, 87 Fed.Cl. 594 (2009).