# United States Court of Appeals for the Federal Circuit

---

**ARKANSAS GAME & FISH COMMISSION,**
*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2009-5121, 2010-5029

---

Appeals from the United States Court of Federal Claims in case no. 05-CV-381, Judge Charles F. Lettow.

---

Decided: March 30, 2011

---

JULIE D. GREATHOUSE, Perkins & Trotter, PLLC, of Little Rock, Arkansas, argued for plaintiff-cross appellant. With her on the brief were JAMES F. GOODHART and JOHN P. MARKS, Arkansas Game & Fish Commission, of Little Rock, Arkansas.

ROBERT J. LUNDMAN, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief was IGNACIA S. MORENO, Assistant Attorney General.

---

Before NEWMAN and DYK, *Circuit Judges*, and WHYTE,[*] *District Judge.*

Opinion for the court filed by *Circuit Judge* DYK. Dissenting opinion filed by *Circuit Judge* NEWMAN.

DYK, *Circuit Judge*.

The Arkansas Game and Fish Commission ("the Commission") filed a physical takings claim against the United States in the Court of Federal Claims ("Claims Court"), alleging that the United States had taken its property without just compensation. The Commission claimed that temporary deviations by the Army Corps of Engineers ("the Corps") from an operating plan for Clearwater Dam during the years 1993 to 2000 caused increased flooding in the Commission's Dave Donaldson Black River Wildlife Management Area ("Management Area"). This flooding, in turn, caused excessive timber mortality in the Management Area. The Claims Court concluded that the United States had taken a temporary flowage easement over the Commission's property and awarded a total of $5,778,757.90 in damages. *Ark. Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594, 617, 647 (2009). Because we conclude that the Corps' deviations did not constitute a taking, we reverse.

## BACKGROUND

The Commission owns the Management Area, which is located in northeast Arkansas and consists of 23,000 acres on both banks of the Black River. The Commission operates the Management Area as a wildlife and hunting

---

[*]    Honorable Ronald M. Whyte, District Judge, United States District Court for the Northern District of California, sitting by designation.

preserve and harvests timber, thereafter reforesting the harvested areas. The Corps completed construction of the Clearwater Dam in 1948. The dam is located in southeast Missouri approximately 115 miles upstream of the Commission's Management Area. The reservoir created by the dam is called Clearwater Lake. The primary purpose of the dam was to provide flood protection.

## A

Whenever the Corps constructs a dam, it adopts a water control plan reflected in a Water Control Manual. These water control plans detail release rates, safety features, and other operating instructions. They are required by Corps regulation. U.S. Army Corps of Engineers, Eng'r Reg. No. 1110-2-240, at 2 (Oct. 8, 1982) [hereinafter EM 1110-2-240]. The plans are developed by regional district commanders "in concert with all basin interests which are or could be impacted by or have an influence on project regulation" and then submitted to the Corps for approval. *Id.* at 3, 4.

This case concerns release rates from the dam established by the plan for Clearwater Dam and deviations from the planned rates. The purpose of regulating release rates is to control the flow of the Black River in order to reduce the adverse effects of flooding in downstream areas. The dam cannot be operated in a manner that completely eliminates flooding because water must be released from the dam, and the released water will, to some extent, cause flooding. If the release rates are lower, the height of the flooding is decreased but the period of flooding is increased. If the release rates are higher, the height of the flooding is increased but the period of flooding is decreased. Apparently, agricultural interests favored a lower release rate even though this would lead to longer periods of flooding, while the Com-

mission and those located near Clearwater Lake preferred a higher release rate to return the lake to its normal level more quickly. As will be seen, the claim here is that the Commission's property was damaged by the temporary adoption of a lower release rate during the growing season, prolonging the release period and damaging trees.

In order to understand the parties' respective positions, it is necessary to describe the background of the 1953 plan and the deviations from that plan that are challenged here. The plan for Clearwater Dam was developed over a period of several years and was finally adopted as part of the Clearwater Lake Water Control Manual in 1953. After the Corps completed construction of Clearwater Dam in 1948, it experimented with release levels for five years. Releases were measured by the maximum height of the water at the Poplar Bluff Gauge in the Black River, which is downstream of the dam but upstream of the Management Area. The first maximum levels at Poplar Bluff during this early period were 12 feet during agricultural season and 14 feet during non-growing season. The Corps concluded that "operating experience" showed these high releases negatively affected too many downstream areas. J.A. 9865. Therefore, in 1950, the Corps reduced the maximum release levels to 10.5 feet during growing season and 11.5 feet during non-growing season. After three years during which "no consistent problems [were] encountered," the Corps approved the first Clearwater Lake Water Control Manual in 1953.[1] J.A. 9865. Under the Manual's "normal regulation," releases were regulated so that the water height at Poplar Bluff did not exceed 10.5 feet during growing season and 11.5 feet during non-growing season.

---

[1] The Water Control Manual was amended in 1972 and 1995, but not in respects involving the release rates of water from the dam.

The maximum release levels at Poplar Bluff allowed for the quick release of water during the growing season, so flooding occurred in short-term waves rather than over extended periods. The Manual's normal regulation somewhat mimicked the natural flooding patterns in the region. During the 1993–2000 period, the Manual's "normal regulation" releases were the same as under the original 1953 plan.

The Clearwater Lake Manual allowed for deviations from the "normal regulation" releases for (1) emergencies, (2) "unplanned minor deviations," such as for construction or maintenance, and (3) "planned deviations" requested for agricultural, recreational, and other purposes. J.A. 9907–08. The deviations in question here fell into the latter category. According to the Manual, the Corps was "occasionally requested to deviate from normal regulation." *Id.* at 9907. Planned deviations had to be approved by the Corps' Southwestern Division, which was required to consider "flood potential, lake and watershed conditions, possible alternative measures, benefits to be expected, and probable effects on other authorized and useful purposes." *Id.* As described in the Manual, these requests were for specific activities that required deviations only for limited periods of time, such as the harvesting of crops, canoe races, and fish spawning. Therefore, the approved deviations were by their nature temporary.

The temporary deviations here began in 1993, forty years after the adoption of the Water Control Manual.[2] In 1993, the Corps approved a "planned deviation" from the Water Control Manual's approved releases for a three month period from September 29 to December 15, 1993,

---

[2]    It appears that there were deviations in years before 1993, but none of those is challenged here. Nor, apparently, were they challenged in the past.

lowering the maximum release level to six feet at the request of agricultural interests that desired slower releases to "allow[] farmers more time to harvest their crops." J.A. 8237–38. No permanent change was made to the Water Control Manual at that time. But in the same year, the Corps fostered creation of the White River Ad Hoc Work Group ("White River Group") to "recommend minor changes to the approved regulating plan[s]" for dams across the White River Basin, which included Clearwater Dam. *Id.* at 8242. In other words, the White River Group was to propose permanent changes to approved plans, including the Clearwater Lake Water Control Manual.

The Corps' regulations provided that water control plans "will be revised as necessary to conform with changing requirements resulting from [new] developments." ER 1110-2-240 at 2. The regulations also required that "plans will be subject to continuing and progressive study by personnel in field offices of the Corps." *Id.* Substantive revisions "require[d] public involvement and public meetings," and the Corps was required to provide a report to the public at least 30 days before the meeting "explain[ing] the recommended . . . change . . . explaining the basis for the recommendation . . . [and providing] a description of its impacts." *Id.* at 4a. Moreover, in making revisions, the Corps was also required to "comply with existing Federal regulations," such as the National Environmental Policy Act ("NEPA"). *Id.* at 2, A-1.

The White River Group included private recreational, agricultural, navigational, and hydropower interests, as well as state and federal agencies such as the Commission. The Commission objected to deviations from the approved water releases in the 1953 plan that would lower the release rates because such deviations would prolong the release period. The lower maximum release

rates meant that water would evacuate from Clearwater Dam more slowly, causing consistent downstream flooding in the Management Area during the tree growing season.  (The tree growing season lasts, on average, from April 4 to October 11 each year, and the "critical months" are June, July, and August.)  Higher maximum release rates, on the other hand, would result in short-term waves of flooding that would quickly recede. The Commission specifically complained that the lake was 530 feet deep on April 15, 1994, and that, at the lower maximum rates, it took sixty days of constant releases for the lake to reach its targeted summertime level, flooding the Management Area for most of that two-month period.

In 1994, the White River Group, unable to recommend permanent revisions to the release plan, proposed a year "interim operating plan" that called for temporary deviations during an eight month period.  J.A. 8244.  The Corps approved "the proposed interim operating plan" as a deviation from April 1994 through April 1995, allowing deviations from the normal release rates from April through November.  *Id.* at 8241.  The plan set the maximum target level at 11.5, instead of 10.5 feet, for the first two weeks in April and then set the maximum level at 8 feet for the next month and 6 feet from mid-May through November.  In February 1995, when the White River Group again proved unable to propose a final plan, the Corps approved an extension of the "interim operating plan . . . to continue as a deviation" for another 12 months through April 1996, allowing deviations from April to November.  *Id.* at 8251.  The Corps noted that it would "monitor the effectiveness of the interim operating plan" during that period.  *Id.*

In February 1996, the White River Group formed a subcommittee of solely Black River interests ("the Black River Group"), including the Commission, to recommend a

plan for Clearwater Dam. The Black River Group also could not reach consensus on a proposed permanent deviation plan for Clearwater Dam. Instead, the Corps approved a new "Interim Operating Plan" proposed by the Black River Group for Clearwater Dam for another 12 months through April 15, 1997, with deviations occurring April through November. The Corps said it would "continue to monitor the effectiveness" of both the White River and Black River "interim operating plans." *Id.* at 8254. The new Black River Group interim plan differed from the prior interim plan recommended by the White River Group. It set the release rate at 6 feet in June and at 5 feet from July through November. This interim plan lapsed in April 1997, and no new interim plan was immediately adopted, leaving the 1953 Manual release rates in place. The Corps did, however, approve a temporary planned deviation in accordance with the Manual from June 3, 1997, to July 5, 1997, to prevent possible flooding and another temporary planned deviation from June 11, 1998, to November 30, 1998, in response to a request from agricultural interests.

The White River Group disbanded in 1997 when it recommended a final plan for the rest of the White River Basin, but the Black River Group continued to work on a plan for Clearwater Dam. The Black River Group finally recommended a proposed plan on September 15, 1998, and that plan was approved as a temporary deviation for 13 months from December 1, 1998, to December 31, 1999, with deviations occurring during the entire 13 month period. This proposed plan also differed from the interim plans approved in prior years, setting the maximum level at 4 feet from mid-May through November but increasing the maximum level if the lake behind Clearwater Dam filled to a certain volume.

In 1999, the Corps began the process of adopting a revised permanent release plan for Clearwater Dam. In keeping with federal regulations, the Corps prepared an Environmental Assessment ("EA"). An EA is a brief report, without detailed descriptions or data, indicating possible environmental consequences that can help determine whether a more extensive Environmental Impact Statement ("EIS") is necessary pursuant to NEPA. An EIS is necessary where there is a possibility of significant environmental impacts. In comments made on the draft EA, the Commission objected to the proposed changes to the Water Control Manual. The Corps agreed that the proposed revision would require an EIS under NEPA.

Meanwhile, the Corps approved the continuation of the 1999 deviations for 11 months through December 1, 2000, as "a temporary Water Control Plan." J.A. 8294. In May 2000 and March 2001, the Corps and Commission together conducted tests to determine the environmental impact on the Management Area when certain levels of water were released from Clearwater Dam. In doing so, the Corps confirmed that tree roots would be flooded under the proposed plan, which could potentially damage or destroy the trees. Therefore, the Corps declined to further pursue a permanent revision to the 1953 Water Control Manual and returned to the releases set out in the original Manual.

In sum, after approving a planned deviation in 1993, the Corps approved three different interim deviation plans with different release rates during the period from 1994–2000. During some portions of that period no interim plan was in place. When temporary plans were in place, for all but two years (1999 and 2000), the release rates deviated from the 1953 plan during only part of the year, usually April through November. During this entire 1994–2000 period, efforts were made to propose a perma-

nent amendment to the 1953 plan, but no permanent revision to the plan was ever adopted. The effort was finally abandoned in 2001, and the un-amended 1953 plan continued to govern. The chart below summarizes the details of these temporary deviation plans.[3]

| Plan | Date of Plan | Deviations (and Date) | Normal Regulation |
|---|---|---|---|
| 1993 Deviation Request Under Original Plan | 9/29/93 - 12/15/93 | 6 ft (9/29/93 - 12/15/93) | 10.5 ft or 11.5 ft[4] |
| 1994 White River Group Interim Plan | 4/1/94 - 4/15/95 | 11.5 ft (4/1/94 - 4/14/94) | 10.5 ft |
| | | 8 ft (4/15/94 - 5/14/94) | 10.5 ft |
| | | 6 ft (5/15/94 - 11/30/94) | 10.5ft or 11.5 ft |

---

[3] In the chart, the deviations are described by the targeted water height levels at Poplar Bluff Gauge. Most of the deviation plans also included alternative target levels if Clearwater Lake, located behind the dam, reached certain elevations. For example, under the 1994 interim plan, the target level at Poplar Bluff Gauge from May 15 to November 30 was six feet unless Clearwater Lake became 70 percent full, in which case more water would be released to a target level of 8 feet at Poplar Bluff. For purposes of simplification, these alternative target levels have not been included in the chart.

[4] The normal regulation is 10.5 feet during agricultural season and 11.5 feet during non-growing season.

| | | 11.5 ft (4/1/95 - 4/15/95) | 10.5 ft |
|---|---|---|---|
| White River Group Interim Plan Extension | 4/15/95 - 4/15/96 | 8 ft (4/15/95 - 5/14/95 | 10.5 ft |
| | | 6 ft (5/15/95 - 11/30/95) | 10.5 ft or 11.5 ft |
| | | 11.5 ft (4/1/96 - 4/15/96) | 10.5 ft |
| 1996 Black River Group Interim Plan | 4/15/96 - 4/15/97 | 11.5 ft (4/15/96 - 5/20/96) | 10.5 ft |
| | | 6 ft (6/1/96 - 6/30/96) | 10.5 ft |
| | | 5 ft (7/1/96 - 11/30/96) | 10.5 ft |
| 1998 Deviation Request Under Original Plan | 6/11/98 - 11/30/98 | 5 ft (6/11/98 - 11/30/98) | 10.5 ft or 11.5 ft |
| 1998 Black River Group Proposed Plan | 12/1/98 - 12/31/99 | 11.5 ft (12/1/98 - 5/14/99) | 10.5 ft or 11.5 ft |
| | | 4 ft (5/15/99 - 11/30/99) | 10.5 ft or 11.5 ft |

| Black River Group Proposed Plan Extension | 1/1/00 - 12/1/00 | 11.5 ft (1/1/00 - 5/14/00) | 10.5 ft or 11.5 ft |
|---|---|---|---|
| | | 4 ft (5/15/00 - 11/30/00) | 10.5 ft or 11.5 ft |

B

In 2005, the Commission brought suit against the United States under the Tucker Act, 28 U.S.C. § 1491, claiming that the temporary release rate deviations during the 1993–2000 period constituted a taking of a flowage easement entitling the Commission to compensation. The Commission alleged that the deviations caused repeated increased flooding and damaged and destroyed timber in the Management Area. The United States denied that a taking had occurred. The United States argued that any increased flooding was only temporary and constituted, if anything, a tort rather than a taking. The United States also argued that the damage was not substantial enough to constitute a taking and that the effects in any event were not predictable, again defeating a takings claim.

A hearing was held before the Claims Court from December 1, 2008, to December 12, 2008, in which eighteen witnesses testified. In addition to addressing the nature of the deviations from the 1953 plan (described above), the hearing addressed two other issues: the substantiality of the flooding and the predictability of the alleged damage.

With respect to the substantiality of the flooding, the Commission's testimony showed that the Management Area flooded regularly during the 1993–2000 period,

including during the tree growing season. The presence of standing water or saturated soil during tree growing season can weaken the roots of the multiple species of oak trees located in the Management Area, which can also render the oaks more susceptible to drought conditions.

The flooding was not consistent from year to year. The parties' experts disagreed as to the amount of increased flooding. Two experts for the Commission, Drs. Heitmeyer and Overton, testified about the extent of the increased flooding. Both used the height of the Corning water gauge along the Black River (downstream of the Poplar Bluff gauge) as a proxy for when flooding occurred, observing that flooding occurred when the Corning gauge reading was over 5 feet. Dr. Heitmeyer reported that the gauge exceeded 5 feet (the level at which flooding occurred) during the tree growing season about 29 more days per year from 1993–1999 than from 1949–1992. Dr. Overton compared the gauge readings from 1981–1992 to the readings from 1993–1999. He explained that the Corning gauge reached a level where substantial flooding occurred (between 8 and 10.5 feet) an average of 24 more days per year during the tree growing season from 1993–1999 than from 1981–1992. Dr. Overton's data also indicated that flooding occurred in the Management Area an average of 8.5 more days per year from 1993–1999 during the "critical" tree growing period of June to August.

During 1999 and 2000, the region suffered a moderate drought. Therefore, according to both the United States and the Commission, the deviations during 1999 and 2000 did not have much practical effect because the water flow was low and did not cause flooding. However, the Commission witnesses testified that drought conditions increased tree mortality in the Management Area. Trees

weakened by six years of additional flooding during the tree growing season could not survive the drought.

The final question addressed at the hearing was the predictability of the results following the government's actions. The Claims Court found that the Corps was unaware in 1993 that deviations would cause additional flooding in the Management Area. Indeed, one Corps official testified that the Corps believed the downstream effect of the deviations would diminish before the water reached Arkansas. However, the Commission sent repeated letters to the Corps claiming that the ongoing deviations were causing additional flooding in the Management Area and also raised its concerns in the White River Group and Black River Group meetings. Still, in its 1999 draft EA, the Corps would have found "no significant impact" based on the proposed revisions to the plan. The Corps only changed its mind about the effects of the deviations after conducting the May 2000 and March 2001 test releases with the Commission which confirmed the possible adverse impacts on the Management Area and led the Corps to return to the release rates in the original 1953 plan.

The parties also disputed the issue of causation and the amount of damage caused by the flooding. The Commission's expert testified that half of the damaged trees would die within five years and the living damaged trees were worth half of their original value. The United States argued that this testimony was inadmissible because so-called cruise maps on which the testimony was based had been destroyed and that the expert evidence in any event used unreliable guesses and was inadmissible under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals.*, Inc., 509 U.S. 579 (1993). The Commission also sought regeneration costs to restore areas suffering from invasions of new wetland vegetation to

their pre-deviation condition.  The United States contended that the Commission failed to prove the United States' actions resulted in the devaluation from invasive growth and, even if it did, the damages were only consequential.

C

The Claims Court concluded that the deviations from the 1953 Water Control Manual were "interim deviations" that were "approved at various times from 1993 to 2000." 87 Fed. Cl. at 603.  The court also found that:

> Certainly no *permanent* flowage easement in the Management Area was taken by the flooding attributable to the Corps' deviations from the operating Plan for Clearwater Dam. . . .  [A] *temporary* flowage easement is a necessary foundation for the Commission's takings claim, as has always been evident from the Commission's pleadings and proofs."

*Id.* at 617 (emphasis in original); *see also id.* at 619–20 (finding appropriation was "temporary rather than permanent").  The court concluded that a takings claim could be based on such a temporary activity.  *Id.* at 618.

The Claims Court relied on the observations by Drs. Heitmeyer and Overton and determined that the deviations caused a substantial enough increase in flooding to constitute the taking of a flowage easement.  It also held that the flooding was the predictable result of government action because with any "reasonable investigation of the effects of the deviations . . . it would have been able to predict" that the deviations would cause flooding and damage timber in the Management Area.  87 Fed. Cl. at 623.  The Claims Court also concluded that the increased tree growing season flooding caused increased timber

mortality in the Management Area, and therefore awarded damages based on the loss of timber and regeneration costs for some areas that had been inundated by new wetland vegetation. The Claims Court awarded $5.5 million in damages for dead or declining timber, relying on the Commission expert's testimony about the value of the trees.[5] It also awarded $176,428.34 in damages for regeneration costs, but it granted damages only for areas classified as having suffered "severe" rather than "heavy" or "moderate" effects.

The United States appealed, contending that no taking had occurred, and that if it had, the damages were overstated. The Commission cross-appealed, contending that the Claims Court should have awarded additional damages for regeneration. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

Determining whether a taking has occurred is a "question of law based on factual underpinnings," and as such, we review the Claims Court's legal analysis and conclusion de novo and its factual findings for clear error. *See Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1352 (Fed. Cir. 2003).

## I

In general, if particular government action would constitute a taking when permanently continued, temporary action of the same nature may lead to a temporary takings claim. *See First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304, 328 (1987). However, cases involving flooding and flowage easements are different. Both Supreme Court prece-

---

[5] The court rejected the claim that the testimony of the Commission's experts should be excluded.

dent and our own precedent dictate that we must distinguish between a tort and a taking. An injury that is only "in its nature indirect and consequential," i.e. a tort, cannot be a taking. *Sanguinetti v. United States*, 264 U.S. 146, 150 (1924). The Supreme Court has long recognized that to be considered a taking overflows must "*constitute an actual, permanent invasion of the land*, amounting to an appropriation of *and not merely an injury to the property*." *Id.* at 149 (emphases added). The Court has stated that an invasion is permanent when there is a "permanent condition of continual overflow" or "a permanent liability to intermittent but inevitably recurring overflows." *United States v. Cress*, 243 U.S. 316, 328 (1917); *see also United States v. Kansas City Life Ins. Co.*, 339 U.S. 799, 810 n.8 (1950) (quoting *Cress* and finding a taking where the plaintiff's land was "permanently invaded by the percolation of . . . waters").

In *Cress*, the Court found a taking where the erection of a lock and dam on the Cumberland River "subject[ed] [the plaintiff's land] to frequent overflows of water." *Cress*, 243 U.S. at 318. The Court explained that these intermittent overflows showed "that this [was] not a case of temporary flooding or consequential injury," where takings liability would be denied, "but [instead] a *permanent condition*, resulting from the erection of the lock and dam." *Id.* at 327 (emphasis added). It further stated that there was "no difference of kind . . . between a permanent condition of continual overflow [which had previously been found to constitute a taking] . . . and a *permanent liability* to intermittent but inevitably recurring overflows." *Id.* at 328 (emphasis added).

In *United States v. Dickinson*, 331 U.S. 745, 746–47 (1947), the Court also found a taking based on a permanent condition. In *Dickinson*, the United States constructed a dam, and the "water above the dam was . . .

impounded to create a deeper channel," thereby permanently raising the river level, "permanently flood[ing]" some of the adjacent land, and subjecting more of it to intermittent overflows. *Id.* at 746–47. Even though Dickinson later "reclaimed most of his land which the Government originally took by flooding," the Court found that the reclamation did not "change[ ] the fact that the land was taken [in the first place] . . . and an obligation to pay for it then arose." *Id.* at 751. The nature of the government's action remained permanent, even though the reclamation had mitigated some of the effects. Again, the Court distinguished between invasions that were permanent or temporary in character. Summarizing these cases, in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 428 (1982), the Supreme Court noted that it has "consistently distinguished between flooding cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion . . . that causes consequential damages within, on the other."

Numerous cases from our predecessor court have similarly held that inherently temporary conditions cannot result in the taking of a flowage easement. *See Barnes v. United States*, 538 F.2d 865, 870 (Ct. Cl. 1976); *Nat'l By-Products, Inc. v. United States*, 405 F.2d 1256, 1273 (Ct. Cl. 1969); *Fromme v. United States*, 412 F.2d 1192, 1197 (Ct. Cl. 1969). "The plaintiff must establish that flooding will 'inevitably recur,' in the phrasing of the *Cress* case." *National By-Products*, 405 F.2d at 1273. "[G]overnment-induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort." *Barnes*, 538 F.2d at 870.

The Commission argues that under our decision in *Ridge Line* a permanent invasion is not required and that appropriation of a "temporary flowage easement" is

sufficient. Commission's Br. 39. This argument is without support. A panel decision of this court cannot, of course, overturn Supreme Court precedent or our precedent. In any event, we did not purport to do so in *Ridge Line*. The case involved a permanent condition—runoff caused by the construction of a postal facility.[6] As such, we had no reason to address whether an inherently temporary condition could be considered a taking. The holding in *Ridge Line* is fully consistent with the *Cress* case's emphasis on the "inevitably recurring" nature of intermittent flooding.

In *Ridge Line* we noted that the Claims Court had erred in "confin[ing] its analysis of liability to whether the government's actions constituted a permanent and exclusive occupation." 346 F.3d at 1352, 1354 (internal quotation omitted). We concluded that "permanent destruction or exclusive occupation by government runoff is not always required for a successful taking[ ]." *Id.* at 1354. In other words, we explained, the "occupation" need not be exclusive and the destruction need not be "permanent." *Id.* at 1352. "[I]ntermittent flooding of private land can constitute a taking of an easement." *Id.* at 1354. Thus, we confirmed that intermittent but inevitably recurring flooding could constitute a taking and that continuous inundation was not required. *Id.* at 1357. But, citing *Barnes*, we noted that "government-induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort." *Id.* at 1355 (quoting *Barnes*, 538 F.2d at 870). The condition leading to the "intermittent, but inevitably recurring" flooding, *id.* at

---

[6] Although the plaintiff later refilled the land eroded by government runoff, *Dickinson*, as discussed above, shows that later reclamation by the plaintiff does not defeat the otherwise permanent nature of an invasion.

1357, must be permanent. Otherwise, it could not be "inevitably recurring."

*Ridge Line* also clarified that, in distinguishing between a tort and a taking, courts must additionally consider 1) whether "the government's actions were sufficiently substantial to justify a takings remedy" and 2) whether the harm suffered by the plaintiff was "the predictable result of the government's action." 346 F.3d at 1355, 1356. The *Ridge Line* court relied on *Sanguinetti*, where the Supreme Court found no taking in that case because it was unclear whether any substantial additional flooding actually occurred and whether the overflow was "the direct result of the [canal]" and thus would be reasonably anticipated by the government. 264 U.S. at 149. Similarly, in *John Horstmann Co. v. United States*, 257 U.S. 138, 146 (1921), the Supreme Court found no taking where flooding was caused by the movement of underground percolating waters "which no human knowledge could even predict."

The parties in this case vigorously dispute whether the extent and frequency of flooding satisfied the substantiality requirement and whether it was predictable. However, we need not decide whether the flooding on the Management Area was "sufficiently substantial to justify a takings remedy" or "the predictable result of the government's action," *Ridge Line*, 346 F.3d at 1355, 1356, because the deviations were by their very nature temporary and, therefore, cannot be "inevitably recurring" or constitute the taking of a flowage easement. For this reason, we also need not address the parties' dispute as to the calculation of damages.

## II

Most government-induced flooding cases involve overflows caused by permanent structures or improvements,

such as dams, canals, or levees. *See, e.g.*, *Dickinson*, 331 U.S. at 746–47 (involving the construction of a dam and the resulting rise in the river level); *Sanguinetti*, 264 U.S. at 147 (involving a canal insufficient to carry away flood waters); *Cress*, 243 U.S. at 327 (involving erection of a lock and dam); *Ridge Line*, 346 F.3d at 1351 (involving runoff caused by construction of Post Office facility); *Nat'l By-Products*, 405 F.2d at 1259–61 (involving a levee built on one side of a creek without a corresponding levee on the other side). Permanent conditions often, but not always, yield inevitably recurring flooding. *Compare Cress*, 243 U.S. at 327 (finding inevitably recurring flooding), *with National By-Products*, 405 F.2d at 1274–75 (finding no taking because plaintiffs did not prove floods caused by levees would inevitably recur).

As with structural cases, in determining whether a governmental decision to release water from a dam can result in a taking, we must distinguish between action which is by its nature temporary and that which is permanent. But in distinguishing between temporary and permanent action, we do not focus on a structure and its consequence. Rather we must focus on whether the government flood control policy was a permanent or temporary policy. Releases that are ad hoc or temporary cannot, by their very nature, be inevitably recurring.

The Commission's entire theory is contrary to governing law. The Commission does not contend that the deviations from the 1953 plan and the resulting flooding were inevitably recurring. Rather, the Commission contends that temporary deviations are sufficient. In its brief, it contended "that [the fact that] the Corps eventually stopped [the] deviations only render[ed] the taking temporary," Commission's Br. 41, and therefore claims "the [United States] appropriated a *temporary* flowage easement for which it must pay," *id.* at 39 (emphasis

added).   At oral argument, the Commission similarly argued that it "do[es] not think the law requires [the deviations] to be permanent or that the government intended . . . to make [them] permanent."   Oral arg. at 18:17–18:25, *available at* http://www.cafc.uscourts.gov/.   It argued again that "the fact that . . . the United States abandoned its easement only makes [the taking] temporary." *Id.* at 20:33–20:41.

The Commission's concession that the government action was temporary in nature is fully consistent with the established facts.  The undisputed facts are clear that the governmental action was designed to be temporary and that the Corps never approved a permanent change in the pre-existing flow rates.  As discussed above, all of the deviations from 1993 to 2000 were approved only as temporary or interim deviations.  The multiple interim plans differed.  Even where deviations were the same in consecutive years, such as in 1994 and 1995, the Corps had to approve an extension of the interim deviation plan for the second year.

The Commission itself similarly referred to the deviations as temporary or interim.  During oral argument, the Commission noted that when deviations first began they were temporary and made in response to particular requests by specific interests and that the permanent revisions to the plan were never approved.  Moreover, in an internal memorandum summarizing the first meeting of the Black River Group in 1996, a Commission official described the 1994–1995 deviations as "a temporary interim plan."   J.A. 9145.   In a later memorandum, a second Commission official acknowledged that "[d]uring the years[ ] 95, 96, and 97[,] the so-called interim plan was tried." *Id.* at 2434.  Martin Blaney, the Commission's Statewide Habitat Coordinator, testified at trial that an "interim plan" had been used from 1998–2000.   Id. at

1811. Similarly, Robert Zachary, the Wildlife Supervisor for the Commission, testified that the Corps' "interim plan of operation" caused tree growing season flooding in 1996. *Id.* at 1687.

Therefore, the numerous deviation plans were inherently temporary, and the Corps, despite considering permanent revisions in 1999, never approved any of the deviations as a permanent policy. In order to make any *permanent* change to the release rates, Corps regulations required compliance with federal regulations. The Corps did not even begin the EA or EIS necessary to comply with NEPA until 1999, and it never completed the necessary steps to implement a permanent revision of the Water Control Plan. As such, the plaintiffs have not met their burden to prove that the increased flooding would be "inevitably recurring" because the deviations were explicitly temporary.

Binding decisions of the Court of Claims, our predecessor court, in *Barnes* and *Fromme* found no taking under similar circumstances. In *Barnes*, the Fort Randall Dam was constructed in 1952, and the government began to release water "to evacuate the excess water accumulation caused by rains and melting snows" in 1969. 538 F.2d at 868. The releases caused intermittent flooding from 1969–1973 and again beginning in 1975. *Id.* at 868–69, 872. Noting that "the flooding [was] of a type which will be inevitably recurring," *id.* at 872, the court determined that a taking had occurred but held that it did not occur until "the permanent character of intermittent flooding could fairly be perceived" in 1973, *id.* at 873. Consequently, it did not allow the plaintiffs to recover for crop damage sustained from 1969–1973 because it was not obvious that the releases and the flooding would be permanent until 1973. *Id.*

In *Fromme*, the Corps constructed a channel and levee near the plaintiff's property. 412 F.2d at 1194. During construction of this project, from 1965–1967, the defendant maintained a "temporary spoil bank," which caused the plaintiff's land to flood "for a substantially longer time than would have been the case if the spoil bank and partially completed levee had not been in existence." *Id.* at 1195. The court held that no taking occurred during the 1965–1967 period because the spoil bank only "represented a temporary situation," and the channel would not lead to the "inevitably recurring floodings which the Supreme Court [had] stressed . . . in *Cress*." *Id.* at 1196–97. Hence, both *Barnes* and *Fromme* indicate that flooding must be a permanent or inevitably recurring condition, rather than an inherently temporary situation, to constitute the taking of a flowage easement.[7]

---

[7]    The Commission argues that *Cooper v. United States*, 827 F.2d 762 (Fed. Cir. 1987) is analogous and supports finding a taking in this case. In *Cooper*, during the period that the Corps was conducting construction along a waterway (1979–1984), part of a river was blocked, subjecting the plaintiff's timbered land "to standing flood water for long periods of time during the [growing season]" of that period. *Id.* at 762. The court found that the temporary flooding constituted a taking of plaintiff's timber. *Id.* at 763. However, the court did not discuss the tort versus taking distinction. Moreover, it explicitly noted that its decision was "not controlled by [ ] cases . . . dealing with flowage easements" because the plaintiff had not requested compensation for a flowage easement. *Id.* We have consistently held that panel authority that does not address an issue is not binding as to the unaddressed issue. *See, e.g.*, *Sacco v. United States*, 452 F.3d 1305, 1308 (Fed. Cir. 2006) (finding that a prior case "is not binding precedent on [a] point because the court did not address the issue" in that prior case); *Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274, 1282 (Fed. Cir. 2002) ("[W]e are not bound by [a prior opinion] on the

Because the deviations from the 1953 plan were only temporary, they cannot constitute a taking. The actions at most created tort liability. We recognize that in other contexts the distinction between a temporary and permanent release plan may be difficult to define. The government cannot, of course, avoid takings liability by characterizing inevitably recurring events as merely a series of temporary decisions. Here, however, the Corps' regulatory scheme has itself clearly distinguished between permanent and temporary release rates. The deviations in question were plainly temporary and the Corps eventually reverted to the permanent plan. Under such circumstances, the releases cannot be characterized as inevitably recurring.

### IV

For the foregoing reasons, we reverse the Claims Court's decision that the United States had taken a flowage easement on the Commission's land without just compensation.

**REVERSED**

COSTS

No costs.

---

issue . . . since [that] issue was neither argued nor discussed in our opinion."); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (stating that if a decision does not "squarely address[ ] [an] issue," a court remains "free to address the issue on the merits" in a subsequent case). Therefore, *Cooper* does not govern. We must follow cases such as *Cress*, *Barnes*, and *Fromme* as to the test for the taking of a flowage easement.

# United States Court of Appeals
# for the Federal Circuit

———————————————

**ARKANSAS GAME & FISH COMMISSION,**
*Plaintiff-Appellee,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

———————————————

2009-5121, 2010-5029

———————————————

Appeal from the United States Court of Federal Claims in 05-CV-381, Judge Charles F. Lettow.

———————————————

NEWMAN, *Circuit Judge*, dissenting.

The Court of Federal Claims found that the six years of improper government induced flooding caused substantial damage to the Donaldson Black River Wildlife Management Area. The flooding resulted from deviations from the agreed water release schedule of the Clearwater Dam Water Control Manual, which schedule had been in place since 1953 and had operated, without injury to the preserve, until the Army Corps of Engineers decided to depart from the Manual and to provide increased flooding from 1993 through 2000. The Arkansas Commission raised strong objections, but the increased flooding was not abated. The Court of Federal Claims found, and my colleagues on this panel do not dispute, that the destruction of valuable hardwood and other

injurious changes in the Arkansas preserve were due to these extensive improper flooding activities.

After the continuing protests by the Commission, the Corps of Engineers finally came to investigate in March 2001 and immediately ceased the increased flooding, stating that there was "clear potential for damage to bottomland hardwoods." Transcript of Colonel Holden's Remarks to the Black River Operations Public Meetings, April 25 and 26, 2001. J.A. 9802. However, the damage had already been done.

The Court of Federal Claims, after a two-week trial including eighteen witnesses, documentary evidence, and an actual site visit, held that a taking of property had occurred in terms of the Fifth Amendment, and awarded damages for the losses incurred.[1] My colleagues on this panel now conclude that no taking occurred and no liability ensued, giving the reason that the Corps eventually abated its destructive flooding. In so ruling, the court departs from constitutional right and well-established precedent. I respectfully dissent.

## DISCUSSION

This Wildlife Management Area spans approximately 23,000 acres along the banks of the Black River in northeastern Arkansas. The Management Area serves as a hardwood timber resource with systematic harvests of mature oak, and also provides habitat for migrating waterfowl and serves as a hunting preserve. The Water Control Plan for Clearwater Dam had been in place for forty years; the water-release plan had been devised after five years of experimental study and interaction of all the interests

---

[1]    *Arkansas Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594 (2009).

served by these waters, and served these interests well, until 1993, when the Corps of Engineers began to deviate from the authorized Plan. The Commission repeatedly complained to the Corps that the deviations were causing extensive flooding that was damaging the bottomland hardwoods and other aspects of the Wildlife Management Area. The Corps did not investigate until 2001, when it confirmed the Commission's concerns and returned to the authorized Water Control Plan.

The floodings drove the hardwood ecosystem to a state of collapse, killing most of the red oaks and many white oaks. Although bottomland ecosystems exist with naturally-occurring seasonal flooding and other climate variations, the nuttall oak and overcup oak, in particular, could not tolerate this artificial flood regime that covered the trees' root systems for extended unnatural periods during the growing season, for six consecutive years. The record states that the increased releases in 1999 and 2000 were less injurious because there was a drought, but the damage had already been done.

The Court of Federal Claims found that the government was responsible for the flooding and the injury caused thereby, that "the damage done to the Commission's property interest in its timber was permanent rather than temporary," and that "the government's superinduced flows so profoundly disrupted certain regions of the Management Area that the Commission could no longer use those regions for their intended purposes, *i.e.*, providing habitat for wildlife and timber for harvest." 87 Fed. Cl. at 620. The court found that "the Corps of Engineers had been repeatedly warned by members of the Commission," and that "the effect of deviations in the Management Area was predictable, using readily available resources and hydrologic skills." *Id.* at 622-23. My colleagues do not dispute these

findings. Instead, my colleagues rule that no property interest was taken in Fifth Amendment terms, on the theory that "[b]ecause the deviations from the 1953 plan were only temporary, they cannot constitute a taking." Maj. op. at 25. This conclusion, and the reasoning on which it is based, diverge from constitutional precedent, and contravene the large body of decisions arising from government operations involving water management.

Government-induced flooding is a recognized physical intrusion. The Court has "long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). In *Loretto* the Court cited flooding cases to illustrate the constitutional treatment of temporary intrusions, observing that they are subject to a "complex balancing process," *id.* at 436 n.12. Applying this balancing process to floodings, the courts have recognized that "isolated invasions, such as one or two floodings . . ., do not make a taking . . . , but repeated invasions of the same type have often been held to result in an involuntary servitude." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1357 (Fed. Cir. 2003) (quoting *Eyherabide v. United States*, 345 F.2d 565, 569 (Ct. Cl. 1965)). When the invasion "preempt[s] the owner's right to enjoy his property for an extended period of time," the principles of constitutional deprivation of property apply. *Id.* at 1356.

Precedent well establishes that when property "is actually invaded by superinduced additions of water . . . so as to effectively destroy or impair its usefulness, it is a taking within the meaning of the Constitution." *Pumpelly v. Green Bay Co.*, 80 U.S. 166, 181 (1872). Precedent does not require constant or permanent flooding, and eventual abatement of the flooding does not defeat entitlement to just

compensation; the specific facts must be considered, as for any invasion of property. *See, e.g.*, *United States v. Dickinson*, 331 U.S. 745, 751 (1947) (finding a taking although the plaintiff reclaimed most of the land that the government had flooded); *United States v. Cress*, 243 U.S. 316, 328 (1917) (a taking occurred where the erection of a lock and dam subjected the plaintiff's land to frequent overflows of water that were intermittent but recurring); *Ridge Line*, 346 F.3d at 1354-1355 (finding that there may be a taking although the property owner had constructed water detention facilities that abated the flooding); *Cooper v. United States*, 827 F.2d 762 (Fed. Cir. 1987) (finding a taking where flooding was remedied by the Corps after five years); *Barnes v. United States*, 538 F.2d 865, 869, 872 (Ct. Cl.1976) (finding a taking where a government dam caused parts of the plaintiff's land to be subject to additional intermittent flooding, reducing crop yields); *Eyherabide*, 345 F.2d at 607 ("The measure of plaintiffs' recovery is for the temporary taking (from 1954 through 1959)," when the plaintiff's land was subject to intermittent physical invasions during that period.).

In turn, short duration floods have been held not to constitute a taking. *See, e.g.*, *Hartwig v. United States*, 485 F.2d 615, 620 (Ct. Cl. 1973) ("The principle may be reduced to the simple expression: One flooding does not constitute a taking."). As another example, the flooding in *National By-Products, Inc. v. United States*, 405 F.2d 1256, 1257 (Ct. Cl. 1969), lasted for only two months, and the court held that the event did not rise to the level of a taking. Also, on facts where the flooding did not produce extensive or permanent damage, a taking did not occur, as in *Sanguinetti v. United States*, 264 U.S. 146, 149-50 (1924) ("Prior to the construction of the canal the land had been subject to the same periodical overflow. . . . If there was any permanent impairment of value, the extent of it does not appear. It was

not shown that the overflow was the direct or necessary result of the structure; nor that it was within the contemplation of or reasonably to be anticipated by the Government.").

When the plaintiff actually benefitted from the government operation, no taking was found, as in *Fromme v. United States*, 412 F.2d 1192 (Ct. Cl. 1969), where construction of a channel caused two years of flooding that left part of the plaintiff's land in a boggy and weedy condition, a condition that was expected to disappear within two to three years. Citing evidence that the land had previously been subject to occasional flooding, and that the new channel was "very beneficial to the plaintiff in connection with the development of an extensive and valuable deposit of sand and gravel in her land," the court concluded that "the evidence in the record fails to show a taking." *Id.* at 1194-97.

Precedent recognizes that the flood-induced destruction of timber is permanent injury, and is compensable within the meaning of the Fifth Amendment. On facts close to those herein, in *Cooper v. United States*, 827 F.2d 762 (Fed. Cir. 1987), during the five-year period in which the Corps of Engineers was conducting construction along a waterway, river blockage subjected Cooper's timbered land to standing flood water for prolonged periods during the spring and summer growing seasons, killing the timber. The court held that the United States had effected a taking, although the flooding was abated by the Corps after five years. *Id.* at 763-64 (citing *Armstrong v. United States*, 364 U.S. 40, 48 (1960); *Murray v. United States*, 817 F.2d 1580, 1583 (Fed. Cir. 1987) (destruction of a property interest is a compensable taking within the meaning of the Fifth Amendment)). The court in *Cooper* awarded compensation based on the value of the destroyed timber. *Id.* at 764.

Binding precedent directly contravenes the court's decision today. The floods in *Cooper* and the government activity that caused them were no less "inherently temporary," the words by which the majority characterizes the flooding, *see* maj. op. at 23, than the recurring flood releases here. In *Cooper* the flooding recurred each year, for as long as the river was clogged by the construction conducted by the Corps, just as the flooding here recurred each year, for as long as the Corps continued the improper release deviations.

Contrary to the court's holding today, no court has held that flooding damage is never compensable if the flooding is eventually stopped, whatever the injury. The decision in *Fromme* is misapplied by my colleagues, for *Fromme* illustrates the traditional balance that characterizes takings decisions, not a *per se* rule against taking if the flooding is eventually stopped. The Court of Federal Claims correctly held that: "The Supreme Court permits recovery based on temporary takings. . . . In effect, the temporary taking of a flowage easement resulted in a permanent taking of timber." 87 Fed. Cl. at 624. The trees that were killed did not revive. No error has been shown in the trial court's view of the facts and law.

My colleagues err in their analysis, incorrectly holding that the issue is solely whether the injurious flooding was eventually ended. My colleagues err in ruling that: "we do not focus on a structure and its consequence. Rather we must focus on whether the government flood control policy was a permanent or temporary policy." Maj. op. at 21. That view of the Fifth Amendment is incorrect. *See, e.g.*, *Owen v. United States*, 851 F.2d 1404, 1412 (Fed. Cir. 1988) (en banc) ("[I]t is not the location of the *cause* of the damage that is relevant, but the location and permanence of the *effect* of the government action causing the damage that is the proper focus of the taking analysis."). The question is

not solely whether the Corps' departure from the flood control policy of the Water Control Manual was permanent or was abated after six years, but whether the increased flooding caused significant injury before the flooding was abated, such that, on balance, the Fifth Amendment requires just compensation.

The panel majority appears to acknowledge that "if particular government action would constitute a taking when permanently continued, temporary action of the same nature may lead to a temporary takings claim," maj. op. at 16, but then discards this possibility as a matter of law in concluding that "the deviations were by their very nature temporary and, therefore, cannot be 'inevitably recurring' or constitute the taking of a flowage easement." Maj. op. at 20. Thus the panel majority holds, contrary to law, that because the improper Arkansas flooding was not of permanent duration, there cannot be a taking despite the permanent flood damage. *See, e.g.*, *Navajo Nation v. United States*, 631 F.3d 1268, 1278 (Fed. Cir. 2011) ("Indeed, our precedent requires that temporary reversible takings must be analyzed in the same constitutional framework applied to permanent irreversible takings.") (quoting *Yuba Natural Res., Inc. v. United States*, 821 F.2d 638, 641 (Fed. Cir. 1987)); *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1583 (Fed. Cir. 1993) (explaining that the "limited duration of [a] taking is relevant to the issue of what compensation is just, and not to the issue of whether a taking has occurred").

The findings of the Court of Federal Claims are not disputed by my colleagues as to the nature, cause, and amount of the damage to the Arkansas property. The determination that a compensable taking occurred is fully in conformity with precedent. My colleagues' ruling contradicts the entire body of precedent relating to the application of the Fifth

Amendment to government-induced flooding.  I respectfully dissent.